VINCENT F. GERBINO (VG0555)
SHAUN M. MALONE (SM1543)
**BRUNO, GERBINO, SORIANO & AITKEN, LLP**
445 Broad Hollow Road – Suite 420
Melville, New York 11747
(631) 390-0010
(631) 393-5497 – *facsimile*
*Counsel for Plaintiffs, Liberty Mutual et al.*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X

LIBERTY MUTUAL INSURANCE COMPANY,
AMERICAN STATES INSURANCE COMPANY,
LIBERTY INSURANCE CORPORATION,
LIBERTY MUTUAL FIRE INSURANCE COMPANY,
LIBERTY MUTUAL MID ATLANTIC INSURANCE COMPANY,
LIBERTY MUTUAL PERSONAL INSURANCE COMPANY,
LM GENERAL INSURANCE COMPANY,
LM INSURANCE CORPORATION,
SAFECO INSURANCE COMPANY OF ILLINOIS,
SAFECO INSURANCE COMPANY OF INDIANA,
THE FIRST LIBERTY INSURANCE CORPORATION and
WAUSAU UNDERWRITERS INSURANCE COMPANY,

Case No.: 1:22-cv-3541

**CIVIL COMPLAINT**

                              Plaintiffs,

          -against-

ADVANCED COMPREHENSIVE LABORATORY, LLC D/B/A
TOPLAB,
YAN MOSHE A/K/A YAN LEVIEV,
MARK GLADSTEIN, M.D.,
VICTORIA FRENKEL,
VADIM DOLSKY,

and

*The Unnamed Kickback Defendants*
JOHN AND JANE DOES 1-10
ABC ENTITIES 1-10

                              Defendants.
----------------------------------------------------------------X

1

Plaintiffs, Liberty Mutual Insurance Company, American States Insurance Company, Liberty Insurance Corporation, Liberty Mutual Fire Insurance Company, Liberty Mutual Mid Atlantic Insurance Company, Liberty Mutual Personal Insurance Company, LM General Insurance Company, LM Insurance Corporation, Safeco Insurance Company of Illinois, Safeco Insurance Company of Indiana, The First Liberty Insurance Corporation and Wausau Underwriters Insurance Company (collectively referred to as "Liberty Mutual", "Liberty" or "Plaintiffs"), as and for their Complaint against the Defendants, hereby allege as follows:

## NATURE OF THE ACTION

1.      This action seeks to terminate a massive, on-going fraudulent scheme perpetrated against Liberty Mutual by the Defendants who have exploited the New York "No-Fault" insurance system by submitting more than $2,765,912.34 in fraudulent laboratory toxicology billing to Liberty Mutual. Specifically, the Defendants submitted, or caused to be submitted, fraudulent claims using the United States mail seeking payment for thousands of fraudulent no-fault insurance charges relating to medically unnecessary, illusory, and otherwise un-reimbursable urine drug screening tests (the "Fraudulent Services") purportedly provided to individuals ("Insureds") who claimed to have been involved in automobile accidents and were eligible for coverage under Liberty Mutual's no-fault insurance policies.

2.      Defendants Mark Gladstein, M.D. ("Gladstein" or "Dr. Gladstein"), Victoria Frenkel ("Frenkel") and Vadim Dolsky ("Dolsky") are listed members of Defendant Advanced Comprehensive Laboratory, LLC d/b/a TopLab ("Advanced Lab"), which has billed Liberty Mutual and other New York automobile insurers for the excessive and medically useless Fraudulent Services. Defendant Yan Moshe ("Moshe") is the true owner/controller of Defendant Advanced Lab who lurks in the shadows. Moshe owned and controlled surgical centers and other

2

medical providers who refer patients for bogus drug tests at Advanced Lab. Thus, Moshe must maintain secrecy in his ownership of Advanced Lab to avoid legal issues that arise from self-referrals.

3.  Moshe, Gladstein, Frenkel and Dolsky along with the "Unnamed Kickback Defendants," perpetrated the fraudulent scheme using illegal referral and kickback arrangements to permit Advanced Lab to access a steady stream of New York-based patients and/or patient names, in order to fraudulently bill Liberty Mutual and exploit New York's no-fault insurance system for financial gain without regard to genuine patient needs.

4.  This action seeks to recover more than $1,435,989.84 that the Defendants have wrongfully obtained from Liberty Mutual, and further seeks a declaration that Liberty Mutual is not legally obligated to pay reimbursement of at least $1,329,922.50 in pending no-fault insurance claims that have been submitted by or on behalf of Advanced Lab because:

> (i)      the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds;
>
> (ii)     the Fraudulent Services – to the extent that they were provided at all – were illusory and useless as the results of the urine drug screens were routinely not reported until after any claimed need for the analysis had already passed, and/or the results of the screenings were not incorporated into the Insureds' treatment plans, and played no genuine role in the treatment or care rendered to the Insureds;  and
>
> (iii)    the Fraudulent Services were provided – to the extent that they were provided at all – through the use of illegal kickback and referral arrangements in violation of material licensing laws and regulations.

5.  The Defendants fall into the following categories:

> (i)      Defendant Advanced Lab is a New Jersey limited liability

3

company – that is also registered to conduct business in New York – through which the Fraudulent Services purportedly were performed and were billed to automobile insurance companies, including Liberty Mutual;

(ii)     Defendants Gladstein, Frenkel and Dolsky are registered members of Advanced Lab;

(iii)     Defendant Moshe is the mastermind of the fraudulent scheme and the true owner of Advanced Lab; and

(iv)     The Unnamed Kickback Defendants (John and Jane Does 1-10 and the ABC Entities 1-10) are individuals and entities that "brokered" patients that were treated, or allegedly treated, at their health care facilities, to Advanced Lab for unnecessary tests, in exchange for illegal remuneration. They furthered the fraudulent scheme by steering Insureds to Advanced Lab in exchange for monetary kickbacks from Advanced Lab and its members.

6.     As discussed herein, the Defendants at all relevant times have known that: (i) the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds; (ii) the Fraudulent Services – to the extent that they were provided at all – were illusory and useless as the results of the urine drug screens were routinely not reported or reviewed (or even available in time) for their purported intended purpose, were not incorporated into the Insureds' treatment plans, and played no genuine role in the treatment or care of the Insureds; and (iii) the Fraudulent Services were provided – to the extent that they were provided at all – through the use of illegal kickback and referral arrangements and in violation of material licensing laws and regulations.

7.     As such, Advanced Lab does not now have – and never had – any right to be compensated for the Fraudulent Services that were billed by Advanced Lab to Liberty Mutual.

8.     The chart annexed hereto as **Exhibit "1"** sets forth a representative sample of the fraudulent claims that have been identified to-date that the Defendants submitted, or caused to be

4

submitted, to Liberty Mutual, using the United States mail service.  This chart includes, among other information, the date that the bill (NF-3) that contained the fraudulent charges was received in the mail by Liberty Mutual.

9.     The Defendants' fraudulent scheme continues uninterrupted until the present day, as Advanced Lab continues to seek collection on pending charges for the Fraudulent Services.

10.     As a result of the Defendants' fraudulent scheme, Liberty Mutual has incurred damages of more than $1,435,989.84, and continuing.

THE PARTIES

I.     **Plaintiffs**

11.     Liberty Mutual Insurance Company is a foreign corporation organized under the laws of the State of Massachusetts, is a citizen of the State of Massachusetts, and is duly authorized to conduct business and to issue automobile insurance policies in New York.

12.     American States Insurance Company, is a foreign corporation organized under the laws of the State of Indiana, is a citizen of the State of Indiana, and is duly authorized to conduct business and to issue automobile insurance policies in New York.

13.     Liberty Insurance Corporation is a foreign corporation organized under the laws of the State of Illinois, is a citizen of the State of Illinois, and is duly authorized to conduct business and to issue automobile insurance policies in New York.

14.     Liberty Mutual Fire Insurance Company, is a foreign corporation organized under the laws of the State of Wisconsin, is a citizen of the State of Wisconsin, and is duly authorized to conduct business and to issue insurance policies in New York.

15.     Liberty Mutual Mid Atlantic Insurance Company, is a foreign corporation organized under the laws of the State of Pennsylvania, is a citizen of the State of Massachusetts,

and is duly authorized to conduct business and to issue automobile insurance policies in New York.

16. Liberty Mutual Personal Insurance Company, is a foreign corporation organized under the laws of the State of Massachusetts, is a citizen of the State of Massachusetts, and is duly authorized to conduct business and to issue automobile insurance policies in New York.

17. LM General Insurance Company, is a foreign corporation organized under the laws of the State of Illinois, is a citizen of the State of Illinois, and is duly authorized to conduct business and to issue automobile insurance policies in New York.

18. LM Insurance Corporation, is a foreign corporation organized under the laws of the State of Illinois, is a citizen of the State of Illinois, and is duly authorized to conduct business and to issue automobile insurance policies in New York.

19. Safeco Insurance Company of Illinois is a foreign corporation organized under the laws of the State of Illinois, is a citizen of the State of Illinois, and is duly authorized to conduct business and to issue automobile insurance policies in New York

20. Safeco Insurance Company of Indiana, is a foreign corporation organized under the laws of the State of Indiana, is a citizen of the State of Indiana, and is duly authorized to conduct business and to issue automobile insurance policies in New York

21. The First Liberty Insurance Corporation is a foreign corporation organized under the laws of the State of Illinois, is a citizen of the State of Illinois, and is duly authorized to conduct business and to issue automobile insurance policies in New York.

22. Wausau Underwriters Insurance Company is a foreign corporation organized under the laws of the State of Wisconsin, is a citizen of the State of Wisconsin, and is duly authorized to conduct business and to issue insurance policies in New York.

II.    **Defendants**

23.    Defendant Advanced Lab is a New Jersey limited liability company with its principal place of business in New Jersey, and is authorized to conduct business in the State of New York.

24.    Advanced Lab was organized in New Jersey on or about May 12, 2017, and is nominally controlled by Gladstein, Dolsky and Frenkel, and has Gladstein, Frenkel, and Dolsky as its listed members.

25.    Advanced Lab was used by the Defendants as a vehicle to submit fraudulent New York No-fault insurance billing to Liberty Mutual and other insurers in New York.

26.    On or about April 30, 2019, Advanced Lab filed a Certificate of Alternate Name in New Jersey, indicating that it also does business under the name "TopLab."

27.    Advanced Lab was registered as a foreign limited liability company authorized to conduct business in New York on or about January 10, 2020.

28.    Pursuant to § 802 of New York State's Limited Liability Company Law, Advanced Lab's application for authority to operate as a foreign limited liability company in New York lists Kings County as the county in New York in which the office of the limited liability company is located.

29.    Pursuant to §§ 574 and 575 of New York State's Public Health Law, Advanced Lab performed, or purported to perform, urine drug screens on specimens obtained from persons residing in New York, pursuant to a permit from the New York State Department of Health.

30.    Advanced Lab has submitted over $2,765,912.34 in fraudulent billing to Liberty Mutual relating to toxicology services purportedly provided to individuals who claimed to have

been involved in automobile accidents and whom were eligible for coverage under New York no-fault insurance policies issued by Liberty Mutual.

31.     Defendant Moshe resides in and is a citizen of New York. Moshe was and has a secret controlling interest in Defendant Advanced Lab. Moshe also owns a number of other medical entities that are involved in the scheme, including referring medical professional entities that are unnamed defendants and other medical entities that are part of the fraudulent process of requesting the phony drug tests such as anesthesiology practices.

32.     Defendant Gladstein resides in and is a citizen of New York. Gladstein owned, controlled, and was a member of Defendant Advanced Lab.  According to the sworn testimony of Dr. Gladstein, he is a 50% owner of Defendant Advanced Lab.  Gladstein merely provides to Advanced Lab, through his medical licensure, the cover of legitimacy and nothing else.

33.     Defendant Frenkel resides in and is a citizen of New York. Frenkel owned, controlled, and was a member of Defendant Advanced Lab. According to sworn testimony, Defendant Frenkel is a 5% owner of Advanced Lab and is the day-to-day operational manager.

34.     Defendant Vadim Dolsky resides in and is a citizen of New Jersey.  Dolsky owned, controlled, and was a member of Defendant Advanced Lab. According to sworn testimony, Defendant Dolsky is a 45% owner of Defendant Advanced Lab.  Dolsky is Defendant Moshe's eyes and ears at Advanced Lab and manages the fraudulent scheme.

35.     The John and Jane Doe Defendants, and the ABC Entities, are unnamed defendants and individuals that reside in and around New York and New Jersey.

## JURISDICTION AND VENUE

36.     This Court has diversity jurisdiction over the subject matter of this action under 28

U.S.C. §1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

37.     Pursuant to 28 U.S.C. § 1331, this Court also has federal question jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because the claims arise under the laws of the United States.

38.     In addition, this Court has supplemental jurisdiction over the state law claims asserted in this action, pursuant to 28 U.S.C. § 1367.

39.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391(b)(1), as the Eastern District of New York is the District where one or more of the Defendants resides.

40.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391(b)(2), because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

41.     For example, Advanced Lab performed, or purported to perform, urine drug screens on specimens from individuals in the New York metropolitan area under a permit from the New York State Department of Health and submitted all of the fraudulent billing under New York automobile insurance policies issued to Liberty Mutual's New York-based Insureds, mailing much of the billing and associated documentation in Brooklyn, New York to Liberty Mutual.

42.     Further, upon information and belief, in reliance on the fraudulent claims of Advanced Lab – many of which were mailed in Brooklyn, New York to Liberty Mutual personnel at a Liberty Mutual office in the Eastern District of New York – Liberty Mutual issued payment on the fraudulent claims.

43.     Furthermore, as set forth herein, the Defendants transacted substantial business in

New York, and derived a substantial amount of revenue based on their fraudulent and unlawful business activities in New York.

44.     Moreover, and as set forth herein, the Defendants not only regularly committed tortious acts in New York, but they also committed tortious acts in New Jersey that caused injury to Liberty Mutual in New York.

## ALLEGATIONS COMMON TO ALL CLAIMS

45.     Liberty Mutual underwrites automobile insurance policies in New York.

## I.     An Overview of the Pertinent Law Governing No-Fault Reimbursement

### A.     Pertinent New York Law Governing No-Fault Insurance Reimbursement

46.     New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the health care services that they need. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated thereto (11 N.Y.C.R.R. §§ 65, et seq.), automobile insurers are required to provide Personal Injury Protection Benefits ("PIP Benefits" or "No-Fault Benefits") to Insureds.

47.     In New York, No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for healthcare goods and services.

48.     In New York, an Insured can assign his/her right to No-Fault Benefits to health care goods and services providers in exchange for those services.

49.     In New York, pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or,

10

more commonly, as an "NF-3").

50.    In the alternative, in New York a healthcare provider may submit claims using the Healthcare Financing Administration insurance claim form (known as the "HCFA-1500 form" or "CMS-1500 form").

51.    Pursuant to New York no-fault insurance laws, healthcare services providers are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State professional licensing requirements necessary to provide the underlying services, or if they fail to meet the applicable licensing requirements of any other state in which such services are performed.

52.    For instance, the implementing regulations adopted by the New York Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of healthcare services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York or meet any applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

53.    New York law prohibits clinical laboratories, such as Advanced Lab, from paying kickbacks in exchange for patient referrals or splitting fees with healthcare providers.

54.    New York Public Health Law § 587 provides that, "[n]o clinical laboratory or its agent, employee or other fiduciaries shall make, offer, give, or agree to make, offer, or give any payment or other consideration in any form to the extent such payment or other consideration is given for the referral of services or participate in the division, transference, assignment, rebate, splitting of fees, with any health services purveyor, or with another clinical laboratory." See also 10 N.Y.C.R.R. § 34-2.4.

55.    Similarly, New Jersey law prohibits kickback and fee splitting arrangements between clinical laboratories and any other person in connection with the referral of specimens to

a laboratory, pursuant to N.J.S.A. 45:9-42.42(d).

56.     Under the New York No-Fault insurance laws, a healthcare services provider, including a clinical laboratory, which pays unlawful kickbacks in exchange for patient referrals in violation of New York State licensing requirements or licensing requirements in the state in which the service is performed, is not eligible to receive No-Fault Benefits.

57.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that healthcare providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

58.     In New York, only a licensed healthcare professional may: (i) practice the pertinent healthcare profession; (ii) own and control a professional corporation authorized to operate a professional healthcare practice; (iii) employ and supervise other healthcare professionals; and (iv) absent statutory exceptions not applicable in this case, derive economic benefit from healthcare professional services. Unlicensed individuals may not: (i) practice the pertinent healthcare profession; (ii) own or control a professional corporation authorized to operate a professional healthcare practice; (iii) employ or supervise healthcare professionals; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from professional healthcare services.

59.     New York law prohibits licensed healthcare providers from paying or accepting compensation in exchange for patient referrals.  See, New York Education Law §§ 6509-a; 6531. Additionally, New York law requires the shareholders of a professional corporation to be engaged in the practice of their profession through the professional corporation in order for it to be lawfully licensed. See, N.Y. Business Corporation Law § 1507.

12

60.     Therefore, under the No-Fault Laws, a healthcare provider is not eligible to receive No-Fault Benefits if it is fraudulently incorporated, fraudulently licensed, if it engages in unlawful fee-splitting with unlicensed non-professionals, or if it pays or receives unlawful compensation in exchange for patient referrals.

61.     In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (the "NY Fee Schedule").

62.     When a healthcare provider submits a claim for No-Fault Benefits using the current procedural terminology ("CPT") codes set forth in the NY Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable laws and regulations; (ii) the service described by the specific CPT code that is used was reasonably and medically necessary; and (iii) the service and the attendant fee were not excessive.

63.     Pursuant to New York Insurance Law § 403, the NF-3 forms submitted by healthcare providers to Liberty Mutual and to all other automobile insurers, must be verified by a healthcare provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act which is a crime.

64.     Similarly, all HCFA-1500 (CMS-1500) Forms submitted by a healthcare provider to Liberty Mutual, and to all other automobile insurers, must be verified by the healthcare provider subject to the following warning:

> Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

**B.      Pertinent New Jersey Law Governing No-Fault Insurance Reimbursement**

65.      Like New York, New Jersey has a comprehensive statutory system designed to ensure that motor vehicle accident victims are compensated for their injuries. The statutory system is embodied within the Compulsory Insurance Law (N.J.S.A. 39:6B-1 to 3) and the Automobile Reparation Reform Act (N.J.S.A. 39:6A-l et seq.), which require automobile insurers to provide PIP Benefits to Insureds.

66.      As in New York, under the New Jersey no-fault insurance laws, an Insured can assign his or her right to PIP Benefits to healthcare providers in exchange for their goods or services. Pursuant to a duly executed assignment, a healthcare provider may then submit claims directly to an insurance company in order to receive payment for medically necessary goods or services, using the required claim forms, including the HCFA-1500 form.

67.      In order for a healthcare provider to be eligible to receive No-Fault Benefits in New Jersey, under New Jersey law, it must comply with all significant laws and regulations governing healthcare practice.

68.      Thus, a healthcare provider in New Jersey is not entitled to receive PIP Benefits where it has failed to comply with any statutory and/or regulatory requirement governing healthcare practice, whether or not the underlying services were medically necessary. See, Liberty Mut. Ins. Co. v. Healthcare Integrated Servs., 2009 N.J. Super. Unpub. LEXIS 2416 at* 4 - * 5 (N.J. App. Div. 2009) (healthcare providers are "not entitled to reimbursement for services covered by PIP unless the provider and the services are in compliance with relevant laws and regulations.").

69.      Moreover, in order for a specific healthcare service to be eligible for No-Fault reimbursement in New Jersey, the service itself must be provided in compliance with all significant laws and regulations governing healthcare practice. See, Healthcare Integrated Servs., supra

70.      By extension, insurers such as Liberty are not obligated to make any payments of No-Fault Benefits to New Jersey healthcare providers or for healthcare services that are not in compliance with all

significant statutory and regulatory requirements governing healthcare practice.

71.     In New Jersey, with limited exceptions not applicable here, unlicensed non-professionals may not directly or indirectly employ physicians. See N.J.A.C. 13:35-6.16(f). Therefore, in New Jersey, medical practices are not eligible to receive No-Fault Benefits if: (i) the practice is owned or controlled by unlicensed non-professionals; or (ii) the practice is used by unlicensed non-professionals to directly or indirectly employ physicians.

72.     Pursuant to N.J.A.C. 13:35-6.17, physicians in New Jersey are prohibited from paying or receiving compensation, either directly or indirectly, in exchange for patient referrals.

73.     Among other things, N.J.A.C. 13:35-6.17(c)(l) specifies that:

A licensee shall not, directly or indirectly, give to or receive from any licensed or unlicensed source a gift of more than nominal (negligible) value; or any fee, commission, rebate or bonus or other compensation however denominated, which a reasonable person would recognize as having been given or received in appreciation for or to promote conduct by a licensee including: purchasing a medical product, ordering or promoting the sale or lease of a device or appliance or other prescribed item, prescribing any type of item or product for patient use or making or receiving a referral to or from another for professional services …

74.     N.J.A.C. 13: J5.6.17(c)(l)(ii) specifies that "[t]his section shall be construed broadly to effectuate its remedial intent."

75.     Pursuant to N.J.A.C. 8:43A-3.2, ambulatory care facilities in New Jersey are required to comply with applicable state laws and regulations.

76.     Moreover, N.J.A.C. 8:43A sets various requirements regarding the licensure and operation of ambulatory care facilities in New Jersey. Among other things:

(i)     N.J.A.C. 8:43A-7.2 - N.J.A.C. 8:43A-7.4 require every ambulatory care facility in New Jersey to have a physician on staff as medical director to "be responsible for the direction, provision, and quality of medical services provided to patients", including "[d]eveloping and maintaining written objectives, policies, a procedure manual, an organizational plan, and a quality assurance program for the medical service", and "[e]nsur[ing] that medical staffing patterns are implemented". The medical director also must develop, implement, and review" written

medical policies, including medical staff bylaws, in cooperation ...with the medical staff." The medical director, or another physician designated by the medical director in writing, must be available to the ambulatory care facility "at all times".

     (ii)     N.J.A.C. 8:43A-8.2 - N.J.A.C. 8:43A-8.3 require every ambulatory care facility in New Jersey to have a registered professional nurse on staff as the director of nursing, "who shall be on the premises of the facility during its hours of operation", and who must be responsible – among other things "for the direction, provision, and quality of nursing services provided to patients".

     (iii)     N.J.A.C. 8:43A-3.5 requires every ambulatory care facility in New Jersey to "develop written job descriptions and ensure that personnel are assigned duties based upon their education, training, and competencies, and in accordance with their job descriptions."

     (iv)     N.J.A.C. 8:43A-9.3 requires every ambulatory care facility in New Jersey to "develop and implement written policies and procedures for the administration, control, and storage of medications", including policies and procedures for the use of parenteral medications and for the control of controlled dangerous substances.

     (v)     N.J.A.C. 8:43A-9.5 requires every ambulatory care facility in New Jersey to store drugs under the proper conditions.

     (vi)     N.J.AC. 8:43A-12.6 and NJ.AC. 8:43A-14. 1 - NJ.AC. 8:43A-14.7 require every ambulatory care facility in New Jersey to develop and implement written bylaws, rules, regulations, policies, and procedures for surgical and anesthesia services, including policies and procedures regarding infection prevention and control that meet particularized standards.

77.     Pursuant to N.J.S.A. 39:6A-4, an insurer such as Liberty is only required to pay No-Fault Benefits in New Jersey for reasonable, necessary, and appropriate treatment. Concomitantly, a healthcare provider in New Jersey is only eligible to receive No-Fault Benefits for medically necessary services.

78.     Pursuant to N.J.S.A. 39:6A-2(m):

"Medically necessary" means that the treatment is consistent with the symptoms or diagnosis, and treatment of the injury:

(1)      is not primarily for the convenience of the injured person or provider;

(2)      is the most appropriate standard or level of service which is in accordance with standards of good practice and standard professional treatment protocols, as such protocols may be recognized or designated by the Commissioner of Banking and Insurance, in consultation with the Commissioner of Health and Senior Services or with a professional licensing or certifying board in the Division of Consumer Affairs in the Department of Law and Public Safety, or by a nationally recognized professional organization, and

(3)      does not involve unnecessary diagnostic testing.

79.      Like New York, New Jersey has established a medical fee schedule (the "NJ Fee Schedule") that is applicable to claims for No-Fault Benefits. When a healthcare provider submits a claim for No-Fault Benefits using the CPT codes set forth in the NJ Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

80.      New Jersey has a strong public policy against insurance fraud. This policy is manifested in a series of statutes, including the New Jersey Insurance Fraud Prevention Act (the "IFPA"), N.J.S.A. 17:33A-1 et seq.

81.      A healthcare provider violates the IFPA if, among other things, it:

i.      Presents or causes to be presented any written or oral statement as part of, or in support of, a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim; or

ii.      Prepares or makes any written or oral statement that is intended to be presented to any insurance company in connection with,

or in support of, any claims for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim; or

     iii.     Conceals or knowingly fails to disclose the occurrence of an event which affects a person's initial or continued right or entitlement to (a) any insurance benefits or payment or (b) the amount of any benefit or payment to which the person is entitled.

     iv.     Knowingly assists, conspires with, or urges any person or practitioner to violate any of the above provisions.

     v.     Knowingly benefits, directly or indirectly, from the proceeds derived from a violation of any of the above provisions due to the assistance, conspiracy or urging of any person or practitioner.

See N.J.S.A. 17:33A-4.

82.     Violators of the IFPA may be liable to an insurer for restitution, attorney's fees, and the reasonable costs of the insurer's investigation. See N.J.S.A 17:33A-7(a).

83.     A person that engages in a pattern of fraudulent behavior under the IFPA may be liable to an insurer for treble damages. See N.J.S.A. 17:33A-7(b). The IFPA defines a pattern as five or more "related violations". See N.J.S.A. 17:33A-3. Violations are related if they involve either the same victim, or the same or similar actions on the part of the person or practitioner charged with violating the IFPA. See N.J.S.A.17:33A-3.

## II.     THE LAB TESTING SCHEME

### A. OVERVIEW OF THE SCHEME

84.     Beginning in 2018, and continuing through the present day, Advanced Lab, Moshe, Gladstein, Frenkel, and Dolsky masterminded and implemented a complex fraudulent scheme in which Advanced Lab was used to bill Liberty Mutual and other New York automobile insurers millions of dollars for medically unnecessary, illusory, and otherwise un-reimbursable services;

18

specifically, urine drug screen tests for an exorbitant amount of drugs that were performed for no reason other than to generate profits.

85.     After Advanced Lab was organized, Moshe, Gladstein, Frenkel, and Dolsky sought to maximize the fraudulent billing that they could submit or cause to be submitted to Liberty Mutual and other insurers, by using Advanced Lab as a vehicle to submit fraudulent billing for medically unnecessary urine drug screening to Liberty Mutual and other insurers.

86.     Advanced Lab needed patient referrals, or at least patient names, of individuals allegedly involved in automobile accidents in New York or who were otherwise eligible for coverage under New York's No-Fault Law in order to bill for the Fraudulent Services.

87.     In order to obtain as many patient referrals and names as possible, Advanced Lab, Moshe, Gladstein, Frenkel, Dolsky entered into illegal financial arrangements with the Unnamed Kick-Back Defendants who brokered New York-based patients that were treated, or who purported to be treated, first at various medical clinics located throughout the New York metropolitan area and then at various ambulatory surgery centers, anesthesia practices, and interventional pain management practices located in New York and New Jersey.

88.     Amongst these patient brokers were facilities that were owned by Moshe.

89.     The ambulatory surgery centers ("ASC"), anesthesia practices, and interventional pain management practices that treated, or purported to treat, large volumes of New York No-Fault patients constituted the overwhelming majority of Advanced Lab' referral sources.

90.     These referral sources included, but was not limited to, unsavory entities that were owned by Moshe such as SCOB, LLC; Integrated Specialty ASC, LLC; Healthplus Surgery Center; Dynamic Surgery Center; Excel Surgery Center, L.L.C; and Metro Pain Specialists Professional Corporation, which entities will be discussed *infra*.

91.     The Fraudulent Services billed under the names of Advanced Lab were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds.

### B.   THE SUSPECT CHARACTERISTICS OF ENTITIES THAT REFERRED A LARGE NUMBER OF PATIENTS TO ADVANCED LAB

92.     Moshe is the sole member of Healthplus Surgery, Dynamic Surgery and Excel Surgery among other entities to be discussed. Furthermore, Moshe is not and never has been a licensed physician or other healthcare professional, yet Moshe secretly and unlawfully owned, controlled, and/or derived economic benefit from professional medical entities Citimedical I PLLC ("Citimedical"), Citimed Services, PA ("Citimed") and Premier Anesthesia Associates PA ("Premier") and others – each of which is a medical professional entity, that has treated patients in this case.

93.     Moshe has a long history of involvement in no-fault insurance fraud schemes, in which he secretly and unlawfully owned and controlled numerous healthcare practices, despite his lack of any healthcare license, and used them as vehicles to submit fraudulent no-fault insurance billing to automobile insurers. For example, in previous lawsuits – entitled State Farm Mutual Automobile Insurance Company v. CPT Medical Services, et al., E.D.N.Y. Case No. 04-cv-5045, Travelers Indemnity Company v. Liberty Medical Imaging Associates, PC, et. al., E.D.N.Y. Case No. 07-cv-2519, State Farm Mutual Automobile Insurance Company v. CPT Medical Services, et al., E.D.N.Y. Case No. 04-cv-5045, State Farm Mutual Automobile Insurance Company v. Bronx Healthcare Medical, P.C., et al., E.D.N.Y. Case No. 08-cv-4912, Government Employees Insurance Co., et al. v. New Hyde Park Imaging, P.C., et al., E.D.N.Y. Case No. 11-cv-01166, Government Employees Insurance Co., et al. v. Mani Ushyarov, D.O., et al., E.D.N.Y. Case No.

11-cv-3657, and <u>Liberty Mutual Insurance Company, et al. v. Nexray Medical Imaging, P.C., et al.</u>, E.D.N.Y. Case No. 12-cv-5666 – the plaintiff-insurers credibly alleged that Moshe – together with various combinations of his associates – secretly and unlawfully owned and controlled various medical professional entities, which he used to submit fraudulent no-fault insurance billing for various types of healthcare services, while recruiting various licensed physicians to pose as the nominal or "paper" owners of the medical professional entities in order to conceal the fact that they were unlawfully owned and controlled by Moshe and other non-physicians.

94.     In early 2011, Moshe sought opportunities to increase his illicit profits. To that end, Moshe decided to acquire a series of ambulatory care facilities, so that he could use them as vehicles to continue to submit a massive amount of additional, fraudulent no-fault insurance billing to LIBERTY and other insurers in New York and New Jersey.

95.     In January 2011, Moshe started with and organized Excel Surgery. Thereafter, in mid-2011, Moshe, through Excel Surgery, purchased the assets – including the ambulatory care facility license – of another existing ambulatory care facility. In late 2011, Excel Surgery then commenced operations as an ambulatory care facility located at 321 Essex Street, Hackensack, New Jersey (the "Essex Street Location").

96.     Excel Surgery was required to have a qualified medical director on staff and was required to comply with the numerous regulatory requirements applicable to ambulatory care facilities, which were designed to protect the general public's health and welfare. However, Moshe knew that if he appointed a legitimate physician to serve as Excel Surgery's legitimate medical director, that physician would impede the fraudulent schemes. As a result, Moshe recruited a physician named Navrajan Kukreja, M.D. ("Kukreja") to serve as Excel Surgery's phony "medical director."

97.     In exchange for money from Moshe and Excel Surgery, Kukreja agreed to falsely pose as the true medical director at Excel Surgery, without actually fulfilling the statutory and regulatory requirements applicable to ambulatory care facility medical directors.

98.     Kukreja failed to fulfill the responsibilities applicable to ambulatory care facility medical directors at Excel Surgery. Instead, Moshe operated Excel Surgery in pervasive violation of the pertinent regulations. For example, during Kukreja's purported tenure as Excel Surgery's phony medical director, the NJDOH repeatedly cited Excel Surgery for serious regulatory violations, including, but not limited to:

    i.    Failure to develop written job descriptions and ensure that personnel were assigned duties based upon their education, training, and competencies, and in accordance with their job descriptions, as required by N.J.A.C. 8:43A-3.5(a).

    ii.    Failure to calibrate instruments in accordance with the manufacturers' instructions, as required by N.J.A.C. 8:43A-6.10.

    iii.    Failure to ensure that the director of nursing was on the premises during Excel Surgery's hours of operation, as required by N.J.A.C. 8:43A-8.2.

    iv.    Failure to ensure the development and implementation of policies regarding the administration, control, and storage of medications, including the preparation and use of parenteral medications, as required by N.J.A.C. 8:43A-9.3(b)(4).

    v.    Failure to develop and implement policies and procedures regarding the control of controlled dangerous substances, as required by N.J.A.C. 8:43A-9.3(b)(7).

    vi.    Failure to maintain current, complete medical records as required by N.J.A.C. 8:43A-13. l.

99.     In fact, the regulatory violations at Excel Surgery were so egregious that, pursuant to a consent order dated December 1, 2015, the New Jersey State Board ordered Kukreja to cease and desist from the practice of medicine based upon—amongst other hazards—NJDOH

inspections at Excel, which "resulted in multiple violations and citations," and also upon allegations that Kukreja had "facilitated the unlicensed practice of medicine while employed at Excel."

100.    Thus, Moshe knew that Kukreja was no longer fit for service as Excel Surgery's phony "medical director." Accordingly, Moshe was forced to find another physician who would be willing to pose as the phony medical director of Excel Surgery.

101.    Thereafter, in sometime in 2013, Moshe recruited Shapiro, another physician who was willing to falsely pose as the phony medical director of Excel Surgery. Shapiro is also the alleged owner of Metro Pain Specialists Professional Corporation, which also refers patients to Advanced Lab.

102.    As had previously been done by Kukreja, in exchange for compensation from Moshe and Excel Surgery, Shapiro agreed to falsely pose as the medical director of Excel Surgery, without actually fulfilling the statutory and regulatory requirements applicable to ambulatory care facility medical directors.

103.    Shapiro failed to fulfill the responsibilities applicable to ambulatory care facility medical directors in New Jersey. As a result, Excel Surgery continued to be cited for serious regulatory violations during Shapiro's purported tenure as medical director, and Shapiro permitted Excel Surgery to engage in fraudulent and unlawful schemes.

104.    For example, during Shapiro's purported tenure as Excel Surgery's "medical director," Excel Surgery was cited by the NJDOH for, among other things:

     i.     Failure to develop written job descriptions and ensure that personnel were assigned duties based upon their education, training, and competencies, and in accordance with their job descriptions, as required by N.J.A.C. 8:43A-3.5(a).

     ii.     Failure to ensure that all newly hired employees were tested

for tuberculosis, as required by <u>N.J.A.C. 8:43A-3.7(d)(I).</u>

    iii.      Failure to maintain current, complete medical records as required by <u>N.J.A.C. 8:43A-13. l.</u>

    iv.      Failure to establish and implement a written patient care quality assurance plan, as required by <u>N.J.A.C. 8:43A-18. l(a).</u>

    v.      Failure to report all fires, disasters, accidents, or other unanticipated events that resulted in the evacuation of patients from the facility to the NJDOH, as required by <u>N.J.A.C. 8:43A-3.8(a)(l).</u>

105.    During Shapiro's purported tenure as Excel Surgery's "medical director", the NJDOH repeatedly concluded that Excel Surgery was not in compliance with the standards for licensure of ambulatory care facilities. Moshe knew that Excel Surgery's history of regulatory violations, and the volume of fraudulent No-Fault billing that he was submitting through Excel Surgery, would draw the continued, unwanted attention of regulatory authorities, as well as insurer investigative departments, law enforcement, and the general public. As such, in November 2016, Moshe organized Dynamic Surgery, and in December 2016 Moshe transferred ownership of Excel's ambulatory care facility at the Essex Street Location to Dynamic Surgery.

106.    Dynamic Surgery commenced operations as an ambulatory care facility at the Essex Street Location, in place of Excel Surgery – but the point is that nothing changed.

107.    The only logical reasons why Moshe transferred the ambulatory care facility from Excel Surgery to Dynamic Surgery was to avoid detection, to conceal the history of regulatory violations at the Essex Street Location from the regulatory authorities, and to conceal and perpetuate the interrelated fraudulent schemes.

108.    As was the case with Excel Surgery, Moshe unlawfully operated Dynamic Surgery without a legitimate medical director. For example, according to an April 9, 2017 report in <u>The Record</u>, Dynamic Surgery's website listed Kukreja as its purported medical director, even though

during the entire period when Dynamic Surgery was operating from the Essex Street Location Kukreja was barred from practicing medicine in New Jersey because of the New Jersey State Board's cease and desist order.

109.    Once The Record published the fact that Dynamic Surgery listed Kukreja – who was barred from practicing medicine – as its purported medical director, Moshe was forced to find another crooked physician who would be willing to pose as the phony medical director of Dynamic Surgery.

110.    Thereafter, in or about mid-2017, Moshe again recruited the reliable Shapiro, who was willing to pose as the phony medical director of Dynamic Surgery, just as he previously had done at Excel Surgery. In exchange for compensation from Moshe and Dynamic Surgery, Shapiro agreed to falsely pose as the true medical director at Dynamic Surgery, without actually fulfilling the statutory and regulatory requirements applicable to ambulatory care facility medical directors.

111.    Shapiro could not legitimately have fulfilled his responsibilities as Dynamic Surgery's medical director, because during the same period of time when he was purporting to serve as medical director at Dynamic Surgery, Shapiro was purporting to serve as medical director at Healthplus Surgery. He was also allegedly operating Metro Pain – another source of referrals to Advanced Lab. Shapiro was also allegedly operating another medical professional corporation called Neurological Diagnostics – another referrer to Advanced Lab – at numerous locations in New York and New Jersey, and was maintaining an extremely busy practice as a treating physician. These activities prevented Shapiro from being available to operate Dynamic Surgery and prevented Shapiro from actually fulfilling his required duties as Dynamic Surgery's medical director.

112.    Moshe proceeded to operate Dynamic Surgery in pervasive violation of the

pertinent regulations, just as he previously had done at Excel Surgery. For example, on June 5, 2018, the NJDOH cited Dynamic Surgery for failure to ensure implementation of patient grievance policies and procedures, and failure to ensure that patients receiving anesthesia did not drive themselves home following their procedures.

113.    Further, on September 24, 2018, the NJDOH once again cited Dynamic Surgery for a number of serious regulatory violations, including:

> i.    Failure to develop and implement policies and procedures regarding the control of controlled dangerous substances, as required by N.J.A.C.-8:43A-9.3(b)(7).

> ii.    Failure to develop and implement policies and procedures regarding infection prevention and control, as required by N.J.A.C. 8:43A-14. l, NJ.AC. 8:43A-14.2, and N.J.A.C. 8:43A-14.3.

114.    Furthermore, the defendants caused Dynamic Surgery to engage in the fraudulent and unlawful schemes throughout the entire course of its operations.

115.    Nevertheless, in late 2018, Moshe wanted to submit even more fraudulent No-Fault billing. However, Moshe was concerned that if he submitted all of the fraudulent No-Fault billing through Excel Surgery or Dynamic Surgery, under a single tax identification number, it would draw the unwanted attention of regulatory authorities, insurers' investigative departments, and law enforcement.

116.    Accordingly, in August 2018, Moshe organized Healthplus Surgery. Thereafter, in November 2018, Moshe caused Healthplus Surgery to purchase the assets – including the ambulatory care facility license – of an existing ambulatory care facility.

117.    In late 2018, Healthplus Surgery commenced operations as an ambulatory care facility located at 190 Midland Avenue, Saddle Brook, New Jersey (the "Midland Avenue Location").

118.   As was the case with Excel Surgery and Dynamic Surgery, Moshe knew that – as an ambulatory care facility – Healthplus Surgery was required to have a qualified medical director on staff and was required to comply with the numerous regulatory requirements applicable to ambulatory care facilities, which are designed to protect the public health and welfare. However, Moshe knew, once again, that if he appointed a legitimate physician to serve as Healthplus Surgery's medical director that the legitimate physician would impede the fraud.

119.   Thereby, in late 2018, Moshe recruited, once again, Shapiro who was once again happy to pose as the phony medical director for Moshe, at Healthplus Surgery.

120.   Thereafter, as was intended, Shapiro again failed to fulfill the responsibilities applicable to ambulatory care facility medical directors at Healthplus Surgery. Again, Shapiro could not legitimately have fulfilled his responsibilities as Healthplus Surgery's medical director, because during the same period Shapiro was engaged in all of the above-described other professional activities.

121.   It should come as no surprise that the regulatory violations at Healthplus Surgery were so pervasive and dangerous to patients that the NJDOH temporarily closed Healthplus Surgery in September 2018 after determining that the unsanitary conditions at Healthplus Surgery may have exposed a massive number of patients to blood borne pathogens such as hepatitis B, hepatitis C, and HIV.

122.   When closing Healthplus Surgery, the NJDOH noted an extremely disturbing series of sanitary and regulatory violations including – but not limited to – the following:

    i.   Failure to develop written job descriptions and ensure that personnel were assigned duties based upon their education, training, and competencies, and in accordance with their job descriptions, as required by N.J.A.C. 8:43A-3.5(a).

    ii.   Failure to ensure the development and implementation of policies regarding the administration, control, and storage of medications, including the

preparation and use of parenteral medications, as required by N.J.A.C. 8:43A-9.3(b)(4) and N.J.A.C. 8:43A-9.5(b).

    iii.      Failure to develop and implement policies and procedures regarding the control of controlled dangerous substances, as required by N.J.A.C. 8:43A-9.3(b)(7).

    iv.      Failure to develop and implement policies and procedures regarding infection prevention and control, as required by N.J.A.C. 8:43A-12.6(a)(16)(ii), N.J.A.C. 8:43A-14.1, N.J.A.C. 8:43A-14.2, and N.J.A.C. 8:43A-14.3.

123.    Among many other things, the NJDOH noted that:

    i.      Healthplus Surgery staff had been observed failing to maintain proper hand hygiene after cleaning operating rooms, when transporting patients, and when handling medication.

    ii.      Healthplus Surgery personnel had been present in sterile environments without the required coverings.

    iii.      The Healthplus Surgery staff nurse who was responsible for day-to-day activities regarding infection control lacked infection control education and training.

    iv.      Healthplus Surgery failed to properly clean its operating room in between surgical procedures.

    v.      Healthplus Surgery transported soiled surgical instruments without ensuring that they were properly secured.

    vi.      Single dose medication bags were reused for multiple patients at Healthplus Surgery.

    vii.      Large amounts of controlled dangerous substances and drugs of abuse - such as Fentanyl - were unaccounted for at Healthplus Surgery, which had no policies and procedures establishing a verifiable record system for controlled drugs.

    viii.      Healthplus Surgery had failed to store medications at the required temperatures.

    ix.      Healthplus Surgery permitted a stretcher to remain in its hallway with a sheet that had "a wet red stain, approximately 2 inches in diameter", and then failed to disinfect the stretcher when the sheet was finally changed at the NJDOH's urging.

124.    Meanwhile, Shapiro falsely purported to own and control Premier when it was in actuality owned by Moshe.

125.    Premier appears as the anesthesia practice that allegedly needed the results of the fraudulent drug tests conducted by Advanced Lab to check for contraindicated drugs before it could administer the anesthesia. As we will see, the results of those tests came days after the anesthesia was already administered. As such, the tests were medically useless.

126.    Because of the investigatory heat on the Moshe Ambulatory Surgery Centers, Shapiro had to masquerade as the owner of Premier. Shapiro's successor "straw owner" at Premier – one Nizar Kifaieh M.D. ("Kifaieh") – gave testimony during a September 2019 examination under oath conducted by another major insurance company that is now a matter of public record. His testimony indicated, among other things, that:

         a)     Kifaieh did not know when Premier was incorporated, or whether anyone invested any start-up capital into Premier Anesthesia, a medical practice he supposedly owned.

         b)     Kifaieh did not pay Shapiro any money in exchange for his purported purchase of Shapiro's "ownership" interest in Premier, nor did Shapiro retain any interest in Premier's existing accounts receivable following the purported "sale".

         c)     The accounting director and general counsel for Hudson Regional Medical Center - which was owned by Moshe - facilitated the purported "sale" of Premier from Shapiro to Kifaieh.

         d)     Premier did not own its own equipment, and all of the equipment and supplies that it used to render healthcare services were provided by Dynamic Surgery, Healthplus Surgery, and Hudson Regional, which were owned by Moshe.

         e)     Kifaieh did not know how patients came to be referred to Premier, or what type of insurance coverage they had.

         f)     Kifaieh did not know who opened Premier's corporate bank account, or the account number.

g)      Kifaieh, the new alleged owner, did not have signatory authority on Premier's corporate bank account and did not believe that Shapiro ever had the "ability to make transactions" on the bank account, either.

h)      However, the accounting director for Hudson Regional - which was owned by Moshe - **did** have signatory authority on Premier's corporate bank account, and controlled the account.

i)      Premier's billing was under the control of a billing company owned by Moshe, pursuant to a verbal agreement, and Premier's billing issues were overseen by Hudson Regional's staff, including its accounting director.

127.    One doctor who allegedly referred multiple patients to Advanced Lab – Dr. Artem Rehman("Rehman") – signed an Affidavit that he never made a single referral to Advanced Lab let alone the dozens of referrals that Advanced Lab claimed.

128.    Another doctor, Dr. Alexander Baldonado, who *has* made multiple referrals to Advanced Lab, was indicted on Medicare Fraud in May of 2021 as part of a multi-state scheme that:

offered COVID-19 tests to Medicare beneficiaries at senior living facilities, drive-through COVID-19 testing sites, and medical offices to induce the beneficiaries to provide their personal identifying information and a saliva or blood sample. The defendants are alleged to have then misused the information and samples to submit claims to Medicare for unrelated, medically unnecessary, and far more expensive laboratory tests, including cancer genetic testing, allergy testing, and respiratory pathogen panel tests. In some cases, and as alleged, the COVID-19 test results were not provided to the beneficiaries in a timely fashion or were not reliable, risking the further spread of the disease, and the genetic, allergy, and respiratory pathogen testing was medically unnecessary, and, in many cases, the results were not provided to the patients or their actual primary care doctors.  The proceeds of the fraudulent schemes were allegedly laundered through shell corporations and used to purchase exotic automobiles and luxury real estate.

129.    Dr. Kristappa Sangavaram also made multiple referrals to Advanced Lab. This doctor was sanctioned for fraudulent behavior by the State of New York:

a)      Please be advised that, by Consent Order (BPMC No. 07-225) of the New York State Department of Health, State Board for Professional Medical Conduct, effective October 22, 2007, Dr. Sangavaram was placed on probation for 2 years because of a New Jersey discipline, which resulted, among other penalties, in a 6–month suspension of his medical license in that state.

b)      Pursuant to Workers' Compensation Law Section 13-d (5), the Chair of the New York State Workers' Compensation Board has exercised his authority to remove Dr. Sangavaram from the list of authorized physicians, effective November 12, 2007, …

c)      Dr. Sangavaram is prohibited from rendering medical or other treatment and care to individuals who have suffered work–related injuries or illnesses. Medical reports submitted by Dr. Sangavaram for treatment or examinations rendered prior to November 12, 2007, are valid, but are invalid for any treatment or examinations rendered on or after that date …

130.    Dr. Sangavaram was further disciplined in 2014 for failure to remedy the deficiencies that led to his initial disciplinary action, i.e.:

On the basis of Respondent's testimony and review of his patient records, two physician consultants and a billing expert hired by the Board found that Dr. Sangavaram had failed to remedy shortcomings identified. Deficiencies noted included, but were not limited to, his continuing to order an excessive number of office visits and an excessive number of procedures; his giving multiple injections during the same office visit; the absence of documentation regarding prescription renewal, medication contracts, or pain scales; and his illegible consent forms.

Dr. Sangavaram was suspended and placed under monitoring.

131.    As demonstrated above, the allegations of kickbacks contained in this complaint are not presented in a vacuum. Rather, they are presented with corroboration consisting of the dangerous, depraved greed on the part of those that refer Liberty Mutual's Insureds to Advanced Lab in exchange for illegal profit.

## C. THE DEFENDANTS' FRAUDULENT TREATMENT AND BILLING PROTOCOL

132.    In virtually all of the claims identified in **Exhibit "1"**, Advanced Lab billed for

31

fraudulent and medically unnecessary urine drug screening tests, involving testing for an exorbitant number of drugs in virtually every urine drug screening test provided, or purportedly provided, to Liberty Mutual's Insureds.

133.    The Defendants maintained an office for Advanced Lab in Brooklyn, New York and, upon information and belief generated many or all of the bills for the fraudulent and medically unnecessary urine drug screening tests from that office.

134.    The Defendants then mailed many or all of the bills for the fraudulent and medically unnecessary urine drug screening tests from Brooklyn, New York.

### 1.    Legitimate Use of Urine Drug Screen Tests

135.    In a legitimate clinical setting, urine drug screens are not medically warranted in advance of pain management procedures such as epidural injections, routine surgery, or anesthesia services.

136.    In a legitimate clinical setting, urine drug screens may be useful in highly select cases, involving more advanced anesthesia services involving a higher risk subset of pre-screened patients to determine whether the patient is taking any medications or using any illicit drugs that might have a negative interaction with the anesthesia.

137.    Similarly, in a legitimate clinical setting, urine drug screens may be useful in advance of prescribing a controlled substance where there are legitimate indications for chronic opioid treatment, legitimate indications that a patient is abusing drugs, or a legitimate question regarding certain medication that a patient is taking, in order to determine whether a patient is taking any medications or using any illicit drugs that might: (i) make them an inappropriate candidate for chronic opioid treatment; or (ii) have a negative interaction with the prescribed medication.

138.     In the limited situations where a urine drug test is warranted, the standard of care for urine drug testing first involves the performance of an initial qualitative test – also known as a "screen" – which defines the result as "positive" or "negative," indicating the presence or absence of a drug or drug class above the detection threshold of the test.

139.     A qualitative test, in other words, determines whether the drug is present in a test specimen, not how much of the drug is present.

140.     The purpose of performing qualitative urine drug screens is to determine whether any one of several drugs and/or types of drugs is present in the specimen obtained from a patient.

141.     Qualitative urine drug screens are performed to separate unexpected results, which may require additional confirmation or quantitative testing, from expected results, which generally do not require any further testing.

142.     In other words, a qualitative test indicating the presence of a drug that is contained in a medication prescribed to the patient is an expected result, which generally would not require further testing. Similarly, a qualitative test indicating the absence of illicit drugs or drugs not contained in medication prescribed to the patient is also an expected result, which generally would not require further testing.

143.     If a qualitative test indicates the presence of an unexpected drug, a confirmation test – which is also known as a quantitative test – may be used to then determine the amount of the drug in the specimen.

144.     A quantitative test may also be used to detect a certain subset of drugs that cannot be detected by an initial qualitative test.

145.     In contrast to qualitative drug testing results – which produces a value of "positive or negative" with respect to a specific drug – quantitative drug testing is a more complex and costly

33

testing process that produces a precise numeric value representing the amount of a specific drug in the specimen.

146.     In a legitimate clinical setting and in the absence of suspected drug use or illicit drug use, quantitative testing of illicit drugs or prescription medication is markedly less frequently medically necessary or reasonable.

147.     For example, absent the finding of a non-prescribed or illicit substance detected during an initial legitimate qualitative urine drug test (i.e., a "positive" result for an unexpected substance), quantitative testing for multiple drugs is not medically necessary unless a practitioner is legitimately testing for specific drugs that cannot be detected in an initial qualitative test.

148.     Accordingly, the routine performance of complex quantitative drug testing for a pre-determined list of drugs is inconsistent with the accepted standard of care and is not medically necessary.

> **2.      The  Fraudulent and Medically Unnecessary Urine  Drug  Tests Performed by Advanced Lab**

149.     In most of the claims identified in **Exhibit "1"**, there was no indication that the Insureds were demographically or medically high-risk, consuming a significant amount of opioids, benzodiazepines, or other controlled substances, or abusing drugs.

150.     Therefore, in most of the claims identified in **Exhibit "1"** there was no legitimate question regarding the medications that the Insureds were taking, and there were no legitimate concerns regarding the performance of the routine surgeries that warranted urine drug screens.

151.     Even so, in the claims identified in **Exhibit "1"** the practitioners associated with Advanced Lab referral sources routinely ordered medically unnecessary urine drug screens in connection with anesthesia services for routine surgeries and/or interventional pain management treatment and procedures that the referring medical practitioner purportedly provided.

152.    The Defendants then submitted, or caused to be submitted, hundreds of urine drug screen charges, billing thousands of dollars for medically unnecessary tests, which were regularly performed without any indication that the Insureds were taking any unreported medications, using any illicit drugs, or had any risk factors warranting such urine drug screens.

153.    The above process was facilitated, by design, by the Advanced Lab "requisition forms". As testified to by Advanced Lab member Defendant Gladstein at a November 10, 2020 examination under oath—and as is evident from the form itself—the Advanced Lab requisition form allows a requester to request with a mere check mark in a box vast groupings of drug tests in addition to testing for PH, specific gravity, etc. The current requisition form available at Advanced Lab's website contains fourteen (14) separate groups of tests. Each group allegedly corresponds to a class of substances that are being tested for i.e., "Benzodiazepines", which group contains some twelve (12) different drugs that can be screened.  Each drug can be individually checked, or a mere check of the box allows for all twelve (12) to be tested. Likewise, a mere check of one box requests that each drug contained in all fourteen (14) separate groups be tested. That results in testing for 71 separate drugs.

154.    These requisition forms are given to ambulatory surgery facilities and various physicians by representatives of Advanced Lab that are "marketers" – employees and others tasked with going to surgery centers, physicians, etc. and convincing these persons and entities to sign up as Advanced Lab clients – to "join … the lab."

155.    However, as demonstrated and as will be further demonstrated, the urine drug tests serve no purpose and do not assist the requestor in any way, shape, or form in treating the patients. As such, there can only be a more sinister purpose – monetary kickbacks – behind the ordering of so many tests, which tests provide no medical benefit to either the Insured or to the referring

medical professional.

156.     For example, patient JA's urine sample allegedly taken on May 19, 2020, was allegedly tested for all 14 groupings – then 70 drugs.  The tests were allegedly administered to determine whether JA was ingesting any drug – whether prescription or illicit – that may contraindicate the use of anesthesia for surgery. This phenomenally expensive battery of urine tests was totally useless because the urine sample was taken the same day that JA received the anesthesia for the surgery, all of which took place on "05/19/2020." There was no way that the results of the testing would be available for consideration prior to the surgical procedure. And the results were not available in time. Advanced Lab's own report states that the urine sample was taken on "05/19/2020" but not reported until "05/21/2020" – two days after the administration of the anesthesia.

157.     Advanced Lab's test report lists the "client" in that case as the notorious ambulatory surgery center Integrated Specialty which is owned and controlled by none other than defendant Yan Moshe.

158.     According to Gladstein, "Ambulatory surgery centers … generate a lot of business" and as such those so called "marketers" that get ambulatory surgery centers to join Advanced Lab receive more money.

159.      In the case of the above patient JA, the anesthesia professional corporation that provided the anesthesia for the procedure was Premier. As demonstrated, *supra*, Premier is also secretly owned and controlled by Moshe in violation of various laws, rules, and regulations.

160.     And so it goes that not only were the urine drug screens medically unnecessary based on the risk profiles of the Insureds and the procedures they were undergoing, but the urine drug screens were also medically unnecessary because – by the time the results of the urine drug

screens were obtained – either: (i) the interventional pain management and anesthesia services had already been performed; or (ii) the referring physician had already issued a prescription for pain management medication.

161.    For example:

(i)      On March 6, 2020, an Insured named AA was referred by Yan Moshe owned ambulatory surgical center SCOB LLC to Advanced Lab for urine drug screens, ostensibly in connection with anesthesia services that were to be provided to AA on March 6, 2020. However, the results of the urine drug screen did not arrive until March 10, 2020 – four days after AA received the anesthesia services;

(ii)     On May 19, 2020, an Insured named JA (discussed above) was referred by Yan Moshe owned ASC – the notorious Integrated Specialty – to Advanced Lab for urine drug screens, ostensibly in connection with anesthesia services that were to be provided to JA on May 19, 2020. However, the results of the urine drug screen did not arrive until May 21, 2020 – two days after JA received the anesthesia services;

(iii)    On December 6, 2019, an Insured named DB was referred by Yan Moshe owned ASC – Integrated Specialty – to Advanced Lab for urine drug screens, ostensibly in connection with anesthesia services that were to be provided to DB on December 6, 2019. However, the results of the urine drug screen did not arrive until December 11, 2019 – five days after DB received the anesthesia services. It should be noted that Moshe owned and controlled Premier Anesthesia purported to provide and did bill for the anesthesia;

(iv)     On April 18, 2018, an Insured named SC was referred by Interstate Multi Specialty Group to Advanced Lab for urine drug screens, ostensibly in connection with anesthesia services that were to be provided to SC on April 18, 2018. However, the results of the urine drug screen did not arrive until April 27, 2018 – nine days after SC received the anesthesia services;

(v)      On April 22, 2018, an Insured named SD was referred by Yan Moshe owned ASC – Dynamic Surgery Center – to Advanced Lab for urine drug screens, ostensibly in connection with anesthesia services/Bilateral Lumbar Medial Branch Nerve Block under Fluoroscopic Guidance (injection) that were to be provided to SD on April 22, 2018. However, the results of the urine drug screen did not arrive until April 27, 2018 - five days after SD received anesthesia services. The alleged injection was performed by Moshe controlled Metro Pain Services – long time Moshe fake ASC medical director Leonid Shapiro M.D. is the alleged owner of

Metro Pain;

(vi)     On June 15, 2019, an Insured named EE was referred by Yan Moshe owned ASC – the infamous Healthplus Surgery Center – to Advanced Lab for urine drug screens, ostensibly in connection with anesthesia services that were to be provided to EE on June 15, 2019. However, the results of the urine drug screen did not arrive until June 19, 2019 – four days after EE received anesthesia services. Of note the Anesthesia services were provided by Moshe owned Premier Anesthesia;

(vii)     On June 17, 2020, an Insured named KG was referred by William Jones, M.D. – a physical medicine and rehabilitation specialist – to Advanced Lab for urine drug screens, ostensibly in connection with pain medicine services that were to be provided to KG1 on June 17, 2020. However, the results of the urine drug screen did not arrive until June 19, 2020 – two days after KG received pain medicine services;

(viii)     On January 7, 2020, an Insured named CG was referred by Advanced Spine and Outpatient Surgery Center to Advanced Lab for urine drug screens, ostensibly in connection with pain medicine services that were to be provided to CG on January 7, 2020. However, the results of the urine drug screen did not arrive until January 17, 2020 – ten days after CG received the pain medicine services. In addition, on March 10, 2020, CG was referred by Dr. Liu, to Advanced Lab for urine drug screens, ostensibly in connection with pain medicine services that were to be provided to CG on March 10, 2020. However, the results of the urine drug screen did not arrive until March 12, 2020 – two days after CG received the pain medicine services;

(ix)     On May 9, 2018, an Insured named DY was referred by Interstate Multi Specialty Group to Advanced Lab for urine drug screens, ostensibly in connection with anesthesia services that were to be provided to DY on May 9, 2018. However, the results of the urine drug screen did not arrive until May 17, 2018 – eight days after DY received the anesthesia services. The procedure consisting of a Lumbar Epidural Sympathetic Nerve Block Injection was allegedly performed by Interstate at ASC Accelerated Surgical Center of North Jersey, LLC. Usually, Advanced Lab reports list the ASC – like Dynamic Surgical Center – as the "client" on the report. However, in this case for some reason Accelerated Surgical Center was not listed even though according to Gladstein's sworn testimony that ASCs are coveted as lucrative clients providing much business;

(x)     On January 29, 2020, an Insured named CZ was referred by Advanced Spine and Outpatient Surgery Center to Advanced Lab for urine drug screens, ostensibly in connection with anesthesia services that were to be provided to CZ on January 29, 2020. However, the results of the urine drug screen did not arrive until January 31, 2020 – two days after CZ

received the medical services; and

(xi)    On February 27, 2020, an Insured named YW was referred by Yan Moshe controlled Metro Pain Specialists P.C. to Advanced Lab for urine drug screens, ostensibly in connection with anesthesia services that were to be provided to YW on February 27, 2020. However, the results of the urine drug screen did not arrive until March 12, 2020 – thirteen days after YW received the medical services. It should be noted that YW testified under oath on August 5, 2020, that YW never had a blood or urine test.

162.    The above are only representative examples. In the claims identified in **Exhibit "1"**, the medical practitioners associated with Advanced Lab's referral sources routinely ordered medically unnecessary urine drug screens that were provided and billed under No-Fault by Advanced Lab, and the results of the urine drug screens were not provided until after the insured received the pertinent anesthesia services or prescription for pain management medication.

163.    What follows are some gross examples. These examples are provided in greater detail than above.

164.    On August 27, 2019, an Insured named CW was referred by the Moshe-owned SCOB LLC to Advanced Lab for urine drug screens, ostensibly in connection with anesthesia services that were to be provided to CW on August 27, 2019. However, the results of the urine drug screen did not arrive until September 3, 2019 – seven days after CW had already received the anesthesia services. The anesthesia was provided by Moshe, who owned Premier Anesthesia. Furthermore, the alleged surgical procedure that allegedly necessitated the provision of anesthesia was provided by Citimedical, also owned my Moshe.

165.    Citimedical is yet another medical practice that is fraudulently owned by Defendant Moshe in violation of a plethora of rules, regulations, and laws.

166.    Citimedical came into existence because as ambulatory surgery centers, Excel Surgery, Dynamic Surgery, and Healthplus Surgery provided surgical facility space to

physicians and other healthcare providers, and generated revenue by charging facility fees to Liberty and other automobile insurers in connection with the surgical and pain management procedures they hosted.

167.    As a result, Excel Surgery, Dynamic Surgery, and Healthplus Surgery's business depended on patient referrals from physicians and other healthcare providers. Unless physicians and other healthcare providers scheduled surgical or pain management procedures at Excel Surgery, Dynamic Surgery, or Healthplus Surgery, they would be unable to generate revenue from facility fees or remain in business.

168.    Moshe understood that the serious regulatory and sanitary violations at his ambulatory surgery centers – beginning at Excel Surgery and continuing at Dynamic Surgery and Healthplus Surgery – would make it difficult for his facilities to obtain legitimate patient referrals from legitimate healthcare providers.

169.    Moshe also knew that his extensive history of no-fault insurance fraud schemes – which had by that point led to him being named as a defendant in numerous, high-profile federal lawsuits alleging no-fault insurance fraud – would likewise make it difficult for his facilities to obtain legitimate patient referrals from legitimate healthcare providers.

170.    Accordingly, Moshe decided to unlawfully own and/or control Citimedical, a professional healthcare practice that he could use – among other things – to generate unlawful self-referrals of patients to Excel Surgery, Dynamic Surgery, and  Healthplus Surgery.

171.    In order to make it happen, in late 2012, Moshe approached his sister Regina Moshe ("Regina") and offered her the opportunity to become the nominal or "paper" owner of Citimedical, a professional medical entity.

172.    Regina was thrilled to receive Moshe's offer because she was not at that point a

candidate for highly-lucrative employment as a physician. She had attended a for-profit medical school outside of the United States, had only recently been licensed to practice medicine, and had not yet been board certified in any medical specialties. In short, she had insignificant experience and credentials.

173.    Moshe provided all start-up costs and investment in Citimedical. Regina did not incur any costs to establish Citimedical's practice, nor did she invest any money in the professional entity that she purportedly owned. Regina was nothing more than Moshe's de facto employee at Citimedical, under the fiction that she was actually the owner.

174.    Moshe used the facade of Citimedical to do indirectly what he was forbidden from doing directly, as a non-physician, namely to: (i) employ healthcare professionals; (ii) control their practices and cause them to refer Insureds to Excel Surgery, Dynamic Surgery, and Healthplus Surgery; and (iii) charge for and derive an economic benefit from the professionals' services.

175.    Indeed, with the exception of a small segment of services that were provided by Citimedical, Regina was not qualified by either her education or training to supervise or direct the performance of the services that were billed to Liberty including, for example, orthopedics, pain management, and anesthesia.

176.    Citimedical operated from a large number of high-volume multidisciplinary clinics in the New York metropolitan area that Moshe also controlled, including clinics located at 1963 Grand Concourse, Bronx, New York; 910 East Gun Hill Road, Bronx, New York; 55 Greene Avenue Brooklyn, New York; 9218 165th Street. Jamaica, New York; and 6336 99th Street, Rego Park, New York, among other locations.

177.    Though ostensibly organized to provide a range of healthcare services to

Insureds at individual locations, these clinics were actually organized to supply convenient locations/venues for a multiplicity of no-fault insurance fraud participants.

178.   Citimedical also unlawfully operated and purported to provide healthcare services from the Essex Street Location, the Midland Avenue Location, and Hudson Regional, which also was controlled by Moshe, despite the fact that Citimedical was a New York professional entity that could not lawfully provide healthcare services in New Jersey.

179.   This brings us to patient MV. On August 20, 2019, an Insured named MV was referred by New Millennium Pain and Spine to Advanced Lab for urine drug screens, ostensibly in connection with anesthesia services that were to be provided to MV on August 20, 2019. However, the results of the urine drug screen did not arrive until September 4, 2019 – fifteen days after MV had received the anesthesia associated with the lumbar epidural steroid injection.

180.   It should be noted that Liberty Mutual received a bill for the above anesthesia services from Metropolitan Medical and Surgical, P.C. which bill was signed by Defendant Dr. Gladstein. As such, Gladstein, as a member of Advanced Lab, billed $1,503.06 for urine tests connected to the anesthesia for which Gladstein billed Liberty $189.07. Gladstein engaged in an illegal self-referral. Yet, as demonstrated, the urine sample was taken from the patient the same day that the anesthesia was provided, and the results of the drug screen did not arrive until 15 days after the provision of Gladstein's anesthesia. As such, Advanced Lab's drug screening for this patient was criminally useless.

181.   Moreover, Dr. Gladstein knew that he was providing a patient with anesthesia without the results of the drug test that he allegedly considered to be medically necessary to the safety of the patient before providing the anesthesia – from which drug test Gladstein

profited as a member of Advanced Lab.

182.    As such, Gladstein is either committing malpractice or fraud or both.

183.    Then there is patient SN. On June 17, 2020, an Insured named SN was referred to Advanced Lab for urine drug screens, ostensibly in connection with anesthesia services that were to be provided to SN on June 17, 2020. However, the results of the urine drug screen did not arrive until June 19, 2020 – two days after SN received the anesthesia.

184.    Of note, Advanced Lab's report in this case lists New Sense Acupuncture as the client. However, an acupuncturist cannot in anyway be connected to the provision of anesthesia or the ordering of urine tests, as acupuncturists are not licensed, medically trained or qualified to render such medical decisions or services.

185.    The physician who requested the drug screen is listed in Advanced Lab's records as a William Jones, M.D. Liberty Mutual received billing that states that the procedure that necessitated the anesthesia was performed at Phoenix Medical Services PC ("Phoenix"), 11 East Hawthorne Avenue, Valley Stream, NY. Phoenix is indeed owned by William Jones, M.D.

186.    Phoenix also billed Liberty $88.19 for a "Drug Screen Cup – 12 Panel" to cover the same June 17, 2020 procedure for which Advanced Lab billed Liberty $2,711.83 dollars for drug screening. This indicates multiple layers of fraud.

187.    In Gladstein's EUO testimony of November 10, 2020, Gladstein clearly acknowledges the fact that the alleged urine sample test results are getting out too late to be of any medical use. Gladstein defended Advanced Lab by stating:

> Well, we don't make the decision of when the procedure is being done, when the specimen is being drawn.  We do not participate in that decision making. We cannot answer this question unfortunately. It's not our job to question.  Our job is to do what we were asked to do and not guess or double guess or assume.

188.     Essentially, Gladstein pleads ignorance as to why the requesting medical providers are ordering high numbers of completely worthless drug screenings. Even he, a conspirator, essentially admits that these screenings are pointless. But he blames the supposed ineptitude of the requesting physicians, ignoring the fact that he and the other defendant co-conspirators designed this referral process to maximize profits as opposed to rendering necessary services in the first place.

189.     History is replete with dastardly deeds being excused by the mantra of "just following orders."  However, Gladstein has admitted knowledge of this fraud. In fact, Gladstein testified to turn around times between collection of a urine sample and the provision of results. Gladstein testified that, under a best-case scenario, the lab can test the urine within 24 to 48 hours of receipt by the lab.  But the specimen must be picked up from the facility – say the ambulatory surgical care facility – by various drivers and brought back to the lab. By the time the sample arrives the lab may be closed. Pick-ups are sometimes missed, etc. And there can be "delays of five days" – in actuality we have seen far worse above as documented by Advanced Lab's own paperwork. Under no circumstances can a specimen be collected, tested and the results received the same day.

190.     No medical professional or anyone for that matter would order expensive testing wherein the results arrived too late to be of any consequence unless there was some form of non-medical motivation. That could only be financial reward also known as a kick back from those – in this case Advanced Lab and its members Gladstein, Dolsky and Frenkel – that profit from the testing.

191.     More evidence of the fact that the urine drug screens were medically unnecessary is the following: in virtually all of the claims identified in **Exhibit "1"**, the putative "results" of

44

the Defendants' urine drug screens were not incorporated into the Insureds' treatment plan, played no genuine role in the treatment or care of the Insureds, and no medical provider responded or reacted to the irregularities on the urine drug tests even when illicit drugs were reported.

192.    Under the circumstances designed by the Defendants, the urine drug screens amounted to the purposeful performance of useless, illusory, and unnecessary urine drug screens solely to generate profits without regard to any patient need.

193.    Further, in order to maximize the profits from the fraudulent charges for the medically unnecessary urine drug screens, Advanced Lab purportedly received referrals requesting **multiple urine drug screens** for each individual insured, but the results of those drug screens, in each instance, were often generated after the insured received the pertinent anesthesia services.

194.    For example:

a)    An Insured named CD was referred to Advanced Lab for urine drug screens on three separate occasions, ostensibly in connection with anesthesia services that were to be provided to CD on March 13, 2019, March 20, 2019, and May 29, 2019. However, the results of each urine drug screen did not arrive until after CD received the anesthesia services.  In total, Advanced Lab billed LIBERY MUTUAL over $8,300.00 for the three separate medically unnecessary urine drug screens.

b)    An Insured named SD was referred to Advanced Lab for urine drug screens on two separate occasions, ostensibly in connection with anesthesia services that were to be provided to SD on April 8, 2018, and April 22, 2018. However, the results of each urine drug screen did not arrive until after SD received the anesthesia services. In total, Advanced Lab billed LIBERTY MUTUAL over $9,200.00 for the two separate medically unnecessary urine drug screens.

195.    The above are only representative examples. In the claims identified in **Exhibit "1"**, Advanced Lab routinely generated the results of urine drug screens after the insureds had already received the pertinent anesthesia services on multiple occasions.

196.    Furthermore, in order to maximize their profits from the fraudulent charges for the medically unnecessary urine drug screens, Advanced Lab frequently billed for both medically

unnecessary qualitative *and* quantitative urine drug screens, ostensibly to confirm the results of contemporaneous in-office qualitative drug screens with negative results that were performed by Advanced Lab's referral sources.

197.    For example:

a)  On or about May 29, 2020, Advanced Lab purported to provide medically unnecessary qualitative and quantitative urine drug screens to an Insured named JA, despite the fact that the contemporaneous qualitative urine drug screen previously provided by Advanced Lab' referral source produced negative results. Advanced Lab billed Liberty Mutual over $2,700.00 for these medically unnecessary urine drug screens;

b)  On or about April 18, 2018, Advanced Lab purported to provide medically unnecessary qualitative and quantitative urine drug screens to an Insured named SC, despite the fact that the contemporaneous qualitative urine drug screen previously provided by Advanced Lab' referral source produced negative results. Advanced Lab billed Liberty Mutual $3,200.00 for these medically unnecessary urine drug screens;

c)  On or about February 22, 2019, Advanced Lab purported to provide medically unnecessary qualitative and quantitative urine drug screens to an Insured named MC, despite the fact that the contemporaneous qualitative urine drug screen previously provided by Advanced Lab' referral source produced negative results. Advanced Lab billed Liberty Mutual over $2,700.00 for these medically unnecessary urine drug screens;

d)  On or about March 13, 2019, March 20, 2019, and May 29, 2019, Advanced Lab purported to provide medically unnecessary qualitative and quantitative urine drug screens to an Insured named CD, despite the fact that the contemporaneous qualitative urine drug screen previously provided by Advanced Lab' referral source produced negative results. Advanced Lab billed Liberty Mutual over $8,300.00 for these medically unnecessary urine drug screens;

e)  On or about April 22, 2018, Advanced Lab purported to provide medically unnecessary qualitative and quantitative urine drug screens to an Insured named SD, despite the fact that the contemporaneous qualitative urine drug screen previously provided by Advanced Lab' referral source produced negative results. Advanced Lab billed Liberty Mutual over $2,700.00 for these medically unnecessary urine drug screens;

f)  On or about January 7, 2020, Advanced Lab purported to provide medically unnecessary qualitative and quantitative urine drug screens to an

Insured named CG, despite the fact that the contemporaneous qualitative urine drug screen previously provided by Advanced Lab' referral source produced negative results. Advanced Lab billed Liberty Mutual over $2,400.00 for these medically unnecessary urine drug screens;

g) On or about May 27, 2020, Advanced Lab purported to provide medically unnecessary qualitative and quantitative urine drug screens to an Insured named PS, despite the fact that the contemporaneous qualitative urine drug screen previously provided by Advanced Lab' referral source produced negative results. Advanced Lab billed Liberty Mutual over $2,400.00 for these medically unnecessary urine drug screens;

h) On or about August 27, 2019, Advanced Lab purported to provide medically unnecessary qualitative and quantitative urine drug screens to an Insured named CW, despite the fact that the contemporaneous qualitative urine drug screen previously provided by Advanced Lab' referral source produced negative results. Advanced Lab billed Liberty Mutual over $2,700.00 for these medically unnecessary urine drug screens;

i) On or about May 9, 2018, Advanced Lab purported to provide medically unnecessary qualitative and quantitative urine drug screens to an Insured named DY, despite the fact that the contemporaneous qualitative urine drug screen previously provided by Advanced Lab' referral source produced negative results. Advanced Lab billed Liberty Mutual over $2,700.00 for these medically unnecessary urine drug screens; and

j) On or about January 29, 2020, Advanced Lab purported to provide medically unnecessary qualitative and quantitative urine drug screens to an Insured named CZ, despite the fact that the contemporaneous qualitative urine drug screen previously provided by Advanced Lab' referral source produced negative results. Advanced Lab billed Liberty Mutual over $2,400.00 for these medically unnecessary urine drug screens.

198.    These are only representative examples. In the claims identified in **Exhibit "1"**, Advanced Lab routinely provided medically unnecessary qualitative *and* quantitative urine drug screens even though contemporaneous qualitative urine drug screens had produced negative results.

199.    Again, under the under the circumstances employed by the Defendants, the performance of qualitative urine drug screens and complex quantitative urine drug screens

amounted to the purposeful performance of useless, redundant urine drug screens solely to generate profits without regard to any real patient need.

200.    In addition, in order to maximize their fraudulent charges for the medically unnecessary urine drug screens, Advanced Lab, in coordination with the "Kickback Defendants," required their various referral sources to establish custom profiles.

201.    These custom-profiles served as standing orders for Advanced Lab to conduct the same set of urine drug screens on every single specimen sent to Advanced Lab, regardless of whether or not each particular urine drug screen was medically necessary.

188.    Advanced Lab's billing submissions to Liberty Mutual virtually always included charges for seventy (70) separate quantitative urine drug screens.

189.    For example:

(i)     Advanced Lab submitted a bill to Liberty Mutual for, among other things, 70 separate quantitative urine drug screens that were purportedly provided to an Insured named AA on or about March 6, 2020. Advanced Lab billed Liberty Mutual $2,711.83 for these 70 separate quantitative urine drug screens;

(ii)    Advanced Lab submitted a bill to Liberty Mutual for, among other things, 70 separate quantitative urine drug screens that were purportedly provided to an Insured named JA on or about May 19, 2020. Advanced Lab billed Liberty Mutual $2,711.83 for these 70 separate quantitative urine drug screens;

(iii)   Advanced Lab submitted a bill to Liberty Mutual for, among other things, 70 separate quantitative urine drug screens that were purportedly provided to an Insured named DB on or about December 6, 2019. Advanced Lab billed Liberty Mutual $2,711.83 for these 70 separate quantitative urine drug screens;

(iv)    Advanced Lab submitted a bill to Liberty Mutual for, among other things, 70 separate quantitative urine drug screens that were purportedly provided to an Insured named SC on or about April 18, 2018. Advanced Lab billed Liberty Mutual $3,200.00 for these 70 separate quantitative urine drug screens;

(v)     Advanced Lab submitted a bill to Liberty Mutual for, among other things, 70 separate quantitative urine drug screens that were purportedly provided to an Insured named SD on or about April 22, 2018. Advanced Lab billed Liberty Mutual $2,783.22 for these 70 separate quantitative urine drug screens;

(vi)    Advanced Lab submitted a bill to Liberty Mutual for, among other things, 70 separate quantitative urine drug screens that were purportedly provided to an Insured named EE on or about June 15, 2019. Advanced Lab billed Liberty Mutual $2,808.13 for these 70 separate quantitative urine drug screens;

(vii)    Advanced Lab submitted a bill to Liberty Mutual for, among other things, 70 separate quantitative urine drug screens that were purportedly provided to an Insured named KG1 on or about June 17, 2020. Advanced Lab billed Liberty Mutual $2,711.83 for these 70 separate quantitative urine drug screens;

(viii)    Advanced Lab submitted a bill to Liberty Mutual for, among other things, 70 separate quantitative urine drug screens that were purportedly provided to an Insured named KG2 on or about January 18, 2019. Advanced Lab billed Liberty Mutual $2,808.13 for these 70 separate quantitative urine drug screens;

(ix)    Advanced Lab submitted a bill to Liberty Mutual for, among other things, 70 separate quantitative urine drug screens that were purportedly provided to an Insured named CG on or about January 7, 2020. Advanced Lab billed Liberty Mutual $2,492.88 for these 70 separate quantitative urine drug screens;

(x)    Advanced Lab submitted a bill to Liberty Mutual for, among other things, 70 separate quantitative urine drug screens that were purportedly provided to an Insured named PS on or about May 27, 2020. Advanced Lab billed Liberty Mutual $2,492.88 for these 70 separate quantitative urine drug screens;

(xi)    Advanced Lab submitted a bill to Liberty Mutual for, among other things, 70 separate quantitative urine drug screens that were purportedly provided to an Insured named CW on or about August 27, 2019. Advanced Lab billed Liberty Mutual $2,711.83 for these 70 separate quantitative urine drug screens;

(xii)    Advanced Lab submitted a bill to Liberty Mutual for, among other things, 70 separate quantitative urine drug screens that were purportedly provided to an Insured named DY on or about May 9, 2018. Advanced Lab billed Liberty Mutual $2,783.22 for these 70 separate quantitative urine drug screens;

(xiii)    Advanced Lab submitted a bill to Liberty Mutual for, among other things, 70 separate quantitative urine drug screens that were purportedly provided to an Insured named CZ on or about January 29, 2020. Advanced Lab billed Liberty Mutual $2,492.88 for these 70 separate quantitative urine drug screens;

(xiv)    Advanced Lab submitted a bill to Liberty Mutual for, among other things, 70 separate quantitative urine drug screens that were purportedly provided to an Insured named YW on or about February 27, 2020. Advanced Lab billed Liberty Mutual $2,711.83 for 70 separate quantitative urine drug screens; and

(xv)    Advanced Lab submitted a bill to Liberty Mutual for, among other things, 70 separate quantitative urine drug screens that were purportedly provided to an

Insured named SM on or about June 17, 2020. Advanced Lab billed Liberty Mutual $2,711.83 for these 70 separate quantitative urine drug screens.

190.    The charges for the seventy (70) separate quantitative urine drug screens were based on the custom-profiles established by Advanced Lab's various referral sources including the Unnamed Kickback Defendants.

191.    Many of the drugs included in the charges for the seventy (70) separate quantitative urine drug screens are not drugs of abuse, including acetaminophen.

192.    Additionally, certain of the drugs included in the charges for the seventy (70) separate quantitative urine drug screens are virtually never consumed by the general public.

193.    Routinely ordering quantitative testing for (i) drugs that are not objects of abuse and (ii) drugs that are virtually never consumed by the general public, is a deviation from the standard of care and is not medically necessary.

### 3.    The Illegal Kickback and Referral Relationship

194.    Advanced Lab needed a constant flow of patient referrals, or at least patient names, in order to bill for the Fraudulent Services.

195.    In order to obtain as many patient referrals as possible, Advanced Lab, Moshe Gladstein, Dolsky and Frenkel entered into illegal financial arrangements with the Unnamed Kickback Defendants who brokered New York-based patients that were treated, or who purported to be treated, at various ambulatory surgery centers, anesthesia practices, and interventional pain management practices located in New York and New Jersey. As stated, some of these very entities were owned by Defendant Moshe.

196.    In coordination with the Unnamed Kickback Defendants, various anesthesiologists and pain management practitioners helped steer Insureds to Advanced Lab for medically unnecessary urine drug screens, ostensibly in connection with either: (i)

anesthesia services that would purportedly be provided to an Insured; or (ii) a prescription for pain management medication that would purportedly be provided to an Insured.

197.    Advanced Lab, Moshe, Gladstein, Dolsky and Frenkel made the various kickback payments in exchange for having Insureds steered to Advanced Lab for the medically unnecessary Fraudulent Services, regardless of the individual's symptoms, presentment, or actual need for additional treatment.

198.    The amount of kickbacks paid by Advanced Lab, Moshe, Gladstein, Dolsky and Frenkel generally was based on the volume of Insureds that were steered to Advanced Lab for the purported Fraudulent Services.

199.    Absent the payment of kickbacks, Advanced Lab's referral sources would not refer patients to Advanced Lab for the medically unnecessary urine drug screens, as Advanced Lab virtually always generated the results of the urine drug screen after the pertinent Insured had either: (i) already received the pertinent anesthesia services; or (ii) already received the pertinent prescription for pain management medication.

200.    The Defendants at all times knew that the kickbacks and referral arrangements were illegal and, therefore, took affirmative steps to conceal the existence of the fraudulent referral scheme, including the particular amounts paid for the kickbacks.

201.    Nevertheless, based on the circumstances surrounding the arrangements with the referral sources Advanced Lab, Moshe, Gladstein, Dolsky and Frenkel paid a financial kickback for each of the particular referrals made for the Fraudulent Services. The payment of the kickbacks was made at or near the time the referrals were issued.

202.    The unlawful kickback and payment arrangements were essential to the success of the Defendants' fraudulent scheme. The Defendants derived significant financial benefit

from the relationships because without access to the Insureds, the Defendants would not have

the ability to execute the fraudulent treatment and billing protocol and bill Liberty Mutual and

other insurers.

203.    Gladstein, during his Examination Under Oath, was evasive as to what medical

professionals would even order the drug tests. For example, Gladstein was asked: "And at the

ASCs, it is the anesthesiologist that would ordinarily make the request for the blood and urine?"

Gladstein responded: "That I don't know sir." (P.49) Gladstein was later asked:

> Q.    Doctor, do you know who would be signing the requisition
> form? Is that usually the physician ordering the test?
>
> A.    That is my understanding, but again, I am not there. I cannot
> answer this question. I can tell you who it is supposed to be, but I mean, I
> don't know.  I don't know what they do in a lot of the ambulatory surgical
> centers or what they do in a doctor's office.  There is a signature for the
> patient, that he agrees in the area for the doctor to sign. I mean, who does
> what, I have no control over.

204.    The above response can best be described as an oblique mess.    Such

equivocation by a medical doctor in his testimony in relation to surgeries and anesthesia that

supposedly require the drug screen services that his own alleged company, Advanced Labs,

provides is telling.

205.    Yet, throughout the EUO, Gladstein made it clear that ambulatory surgery

centers – such a Moshe's – were important as clients because of the volume of business.

206.    Furthermore, as already mentioned, Advanced Lab's reports list the ambulatory

surgery centers as the "client" while listing a medical professional – many times an

anesthesiologist – as the "Requesting physician."  However, Gladstein's lack of knowledge is

indicative of the fact that the so called "requesting physician" is a "requesting physician" in

name only. Any semblance of actual medical necessity for the screening is absent. This is

further supported by the fact, as demonstrated, that the test results arrive days after the result would be of any use.  As such if the test result is knowingly of no use to the physician that allegedly made the request – then there was no legitimate medical need for the request to be made in the first place.

207.   Rather, the true source of the request/referral appears to be non-physician laypersons, such as Moshe, that use the names of medical professionals that they control as alleged test requesters.

208.   Gladstein's testimony further corroborates the above when he describes Advanced Labs' reference to a "client" at an office location:

> Q.   I was just wondering, do you draw a distinction between the client and the actual medical doctor who made the request?
>
> A.   Right.  So, for example, many medical offices or ambulatory surgery centers may have many different medical doctors – working in there.  So, for the logistic point of view, to organize it in a way so we know where the specimen is coming from, **who was the one who ordered it**, we created that division, if you will, which separates one from another … [Emphasis added].

209.   In fact, given Moshe's pervasive control and ownership of every facet of the medical care – especially involving ASCs – from the doctor, to anesthesia to the ASC itself, it is evident that Moshe has an ownership and controlling interest in Advanced Lab which is part and parcel of the ambulatory surgery-drug screening process.

210.   Gladstein testified at his EUO that he is an anesthesiologist.  Further, Gladstein testified that he did not have a business relationship with Moshe, although he contradictorily admitted that he worked in two of Moshe's medical facilities.  Gladstein also testified that he knew that Regina Moshe – Moshe's sister and as described fraudulent owner of Moshe entity Citimedical – had "just had a baby recently" and "she had a birthday party a couple of days ago," thus confirming his association with Moshe and his family.

211.    Moreover, Gladstein's description of his relationship with Dolsky and Frenkel does not appear to be organic to the formation of an enterprise such as Advanced Lab.  Prior to the formation of the lab, Gladstein's contact with Dolsky was minimal and although Gladstein knew Frenkel for 10 years the relationship was vaguely described as "from his medical practice."  This lack of familiarity stems from the fact that the alleged partnership between Gladstein, Dolsky and Frenkel in Advanced Lab was manufactured by a third party—defendant Moshe.

212.    Indeed, Gladstein provides the medical license to Advanced Lab and little else according to his testimony wherein 5% owner Frenkel does all of the real management work and is present at the facility.

213.    It is Defendant Dolsky that is the lynchpin of understanding Defendant Moshe's control over Defendant Advanced Lab.  As stated, Dolsky is a member of Advanced Lab with a purported 45% ownership.

214.    Dolsky is an acupuncturist that allegedly owns a professional corporation named Optimum Health Acupuncture P.C.  In a 2015 Examination Under Oath of Yan Moshe conducted by another insurer, Moshe testified that his ambulatory surgery centers (ASC's) pay Dolsky $20,000 dollars per month to "find new physicians" who will refer patients to the ASCs, and possibly more that we do not yet know about.

215.    Meanwhile, during an Examination Under Oath of Vadim Dolsky, taken by another insurer in 2018, Dolsky was asked:

Q. Do you have any affiliation with any surgical centers?

A. No, I don't.

Q. In any state?

A. Nothing.

Dolsky lied under oath.

216.     Furthermore, it will be recalled as voluminously described *supra,* that the medical professional entity Citimedical, which was allegedly owned by Regina Moshe, was in actuality illegally owned by Defendant Regina Moshe's brother, Defendant Yan Moshe. Initially, Regina Moshe became the purported owner of medical facilities that would become Citimedical at locations wherein Yan Moshe was being sued for his unlawful control and ownership of previous medical facilities, including facilities at 1963 Grand Concourse, Bronx, NY, and 65-55 Woodhaven Blvd, Rego Park, NY.

217.     Citimedical—while maintaining the same locations and arrangements with Defendant Moshe, if not expanding—subsequently morphed into Citimedical Services, P.C. ("Citimedical Services").  Rather quickly, while maintaining the same locations and modus operandi – if not expanding it – Citimedical Services, P.C, would morph or branch out to become Citimed Complete Medical Care P.C.  There is also a Citimed Surgery Center LLC – incorporated on July 12, 2016—which is another of Defendant Yan Moshe's surgical facilities. There are also a host of other Citimedical entities like Citimed Management Services, Inc.[1]

218.     In fact, Regina Moshe testified as to Citimedical Services that she paid her brother Defendant Yan Moshe 10% of receivables for the billing of MRIs and EMG tests.

219.     Regina Moshe also testified that she pays her brother, Yan Moshe, over one million dollars per year in payments alleged to be "rent" for the ownership of the

---

[1] This is the quintessential organized crime "Daisy Chain" of business entities that is meant to confuse authorities and create multiple separate bank accounts under separate entities in order to secrete illegally obtained monies to the true owners and hide said monies.

property where her medical facilities are located. Regina Moshe also paid Defendant Yan Moshe "lease" fees for MRI equipment. These are simply veiled payments of Citimedical's profits to Yan Moshe, as the de facto undisclosed owner of Citimedical.

220.    As of the latest confirmed information, Citimedical Services operated from a large number of high-volume multidisciplinary clinics in the New York metropolitan area that Moshe also controlled.  In each one of the following Citimedical locations, Defendant Dolsky's aforementioned medical professional corporation Optimum Health Acupuncture P.C. also operated: 1963 Grand Concourse, Bronx, New York; 910 East Gun Hill Road, Bronx, New York; 55 Greene Avenue Brooklyn, New York; 9218 165th Street. Jamaica, New York; 65-55 Woodhaven Boulevard, Queens, New York; 14 Mamorneck Avenue, White Plains, New York; JFK Building 14, JFK Airport; JFK Building 75, JFK Airport; 127 East 107th Street, New York, New York; 100-05 Roosevelt Avenue, Astoria, New York; 23-67 Westchester Avenue, Bronx, New York.

221.    At each location, Dolsky pays Regina Moshe exorbitant rent which is then funneled to Defendant Yan Moshe, as evidenced by the artificially-large sums of rent paid to Defendant Yan Moshe by Regina Moshe.  The point is that Defendant Yan Moshe is the true owner of Dolsky's acupuncture P.C. much in the same manner that Defendant Yan Moshe owns every entity in the chain of illegal self-referrals, including Defendant Advanced Lab.

222.    Dolsky is Moshe's "point man" and overseer in the control of Advanced Lab.  Frenkel is the hands-on manager whereas Gladstein, vis-a-vis his medical license, merely provides the needed cover of false legality.

223.    A review of bank records for Advanced Lab from January 9, 2019 through

May 26, 2021, indicates a large outflow of money to various multiple nondescript entities that bear titles indicative of marketing and advertising services, billing services, consulting services, etc. but are in reality money laundering shell corporations designed to generate cash in order to fund kickbacks to participants in the schemes and to funnel profits to Moshe.  This includes such entities as Five Star Advertising Services Corp, ABC Marketing Solutions and MNDNT Corp.

224.    For example, Five Star received $139,700 dollars during the above-stated period of time.  For this alleged corporation, no information or online presence could be found except for the official filing with the State of New York, which disclosed the address as 235 Coleridge St, Brooklyn NY 11235 – Director/Officer Matlyuba Khakimova.

225.    ABC Marketing Solutions also received significant sums of money -- $88,000 dollars.  New York State Department of State records indicate that ABC Marketing Solutions is located at the same address as Five Star and has the same Director/Officer:  235 Coleridge St, Brooklyn NY 11235 – Director/Officer Matlyuba Khakimova.

226.    MNDNT Corp also received significant sums of money – around $127,000 dollars.  New York State Department of State records indicate that MNDNT Corp has the same Director/Officer as ABC and Five Star:  Matlyuba Khakimova

227.    In fact, Matluba Khakimova, ABC, Five Star and MDNT Corp have been named as Defendants in an Insurance Fraud RICO action recently brought by Liberty Mutual – *Liberty Mutual et al v. MC Physical Therapy, P.C.  ... ABC Marketing Solutions Corp., Five Star Advertising Services Corp., MNDNT Corp, Matlyuba*

*Khakimova et al*.  2:2021-cv-06805 E.D.N.Y.

228.    There are several such companies that received alleged payments including Vadim Dolsky's Five Star Services Inc. located at 954 Ponce de Leon Avenue, Suite 208 San Juan, Puerto Rico 00907.  Another example is an entity known as City Wide Marketing & Services for which no information can be found but which received approximately $227,000 dollars.

229.    The money laundering cash generating scheme operates by paying multiple shell entities thereby evading detection due to sheer volume but in the aggregate the amounts that are paid out are well into the millions – this analysis could continue for pages.  As stated, this money is ultimately transferred to Moshe and is also utilized to pay kickbacks in furtherance of the referrals to Advanced Lab of the medically useless drug screening requests.

230.    In addition, despite the generation of kick back cash, there are numerous records of payments to referring medical providers.

231.    Finally, it is noteworthy that Vadim Dolsky – Moshe's close associate – received distributions – $1,039,500 – way out of proportion to his 45% ownership share in Advanced Lab when compared to superior partner Defendant Gladstein (purported share 50%) who received a fraction of that amount, which appears to be a mere $90,000. In fact, the same is true of Defendant Frenkel (5%) when his receipt of distribution funds is compared to that of Dr. Gladstein.  It thus is corroborated that Gladstein, the alleged majority owner of Advanced Lab and the licensed physician who runs it, is in reality a figurehead utilized for the air of legitimacy that surrounds his medical license.

**4.      The Fraudulent Billing Which the Defendants Submitted or Caused to be Submitted to Liberty Mutual**

232.    To support their fraudulent charges, the Defendants systematically submitted, or caused to be submitted, thousands of NF-3 forms, HCFA-1500 forms, and drug screening reports from Advanced Lab to Liberty Mutual seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

233.    The NF-3 forms, HCFA-1500 forms, and drug screening reports submitted to Liberty Mutual by and on behalf of the Defendants were false and misleading in the following material respects:

(i)      The NF-3 forms, HCFA-1500 forms, and reports submitted by and on behalf of the Defendants uniformly misrepresented to Liberty Mutual that the Fraudulent Services were medically necessary. In fact, the Fraudulent Services were not medically necessary and were performed pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds.

(ii)      The NF-3 forms, HCFA-1500 forms, and reports submitted by and on behalf of the Defendants uniformly misrepresented to Liberty Mutual that the Fraudulent Services were provided for patient care. In fact, the Fraudulent Services were illusory as the results of the urine drug screens were routinely not reported or reviewed for their purported intended purpose, not incorporated into the Insureds' treatment plans, and played no genuine role in the treatment or care of the Insureds.

(iii)      The NF-3 forms, HCFA-1500 forms, and reports submitted by and on behalf of the Defendants uniformly fraudulently concealed the fact that the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback and referral arrangements amongst the Defendants and others.

234.    Advanced Lab submits statutory bills (NF-3s) under the name Top Lab with the labs address of 67-71 East Willow Street, Milburn, NJ 07041.  As completed, it is Advanced Lab under the name Top Lab that is billing insurance companies such as Liberty Mutual with the NF-3s that they submit. As such Advanced Lab is the billing entity/provider.

235. Yet, Advanced Lab fills out box 16 of the NF-3 indicating that the treating provider is different than the billing provider.  That does not comport with reality since it is Advanced Lab that is doing the testing via the name Top Lab.

236. For example, with regard to Insured "AA", box 16 of the claim form – "IF TREATING PROVIDER IS DIFFERENT THAN BILLING PROVIDER COMPLETE FOLLOWING" – indicates that an Andres Chipollini ("Chipollini") is the treating provider.

237. Chipollini's role is unclear and the use of his name as the treating provider on the NF-3 confusing.  The lab report also indicates that Chipollini is the "Requesting Physician." Yet Box 15 indicates that the "PLACE OF SERVICE" is Advanced Lab's address which is a place that Chipollini has never been.

238. Furthermore, the lab report for AA indicates that the client is "Surgicare of Brooklyn" a.k.a. SCOB LLC. This is a Moshe owned facility that is located at 313 43rd Street, Brooklyn, New York.

239. Billing and other documents received by Liberty Mutual indicate that the surgical procedure that was performed that necessitated the provision of anesthesia and hence the Advance Lab drug test was performed by one Wendell Joseph Gorum M.D. on March 6, 2020, which is the same day that the alleged urine sample was collected.  The surgical procedure bill indicates under Box 32 "SERVICE FACILITY LOCATION INFORMATION" that the procedure was performed at "313 43rd St, Surgicare of Brooklyn, Brooklyn NY 11232-1120."

240. Further, Chipollini did not provide the anesthesia – rather it was a Gary Ritholz, MD.

241. Chipollini had no role in the above surgical procedure, anesthesia or drug testing yet he is listed as the treating provider on the NF-3 and "Requesting Physician" on the drug

analysis report.

242.    This is nothing but blame deflection for the fact that the urine results come days after the provision of anesthesia for which the results were allegedly needed.

243.    Furthermore, the NF-3 that lists Top Lab as the billing entity fails to fill in Box 17 of the NF-3 which calls for – "IF THE PROVIDER OF SERVICE IS … DOING BUSINESS UNDER AN ASSUMED NAME (DBA), LIST THE OWNER AND PROFESSIONAL LICENSING CREDENTIALS OF ALL OWNERS."

244.    Gladstein's testimony does not lend any credibility to the above, as Gladstein is unaware of who signs the NF-3s on behalf of Advanced Lab.  Further Advanced Lab gets the assignment of benefits form – the form that a patient must sign in order for Advanced Lab to bill the insurance company directly – from "either … the ambulatory surgical center or from the doctor's office."

245.    Most irregular is the fact that Gladstein testified that the NF-3 claim form itself comes from the ambulatory surgical center or the medical office.  In other words, Gladstein testified that Advanced Lab does not even create its own bill; the bill is created by the referring physician on Advanced Lab's behalf.  Gladstein further testified that he does not know who puts the signature on the NF-3 that Advanced Lab uses to bill Liberty Mutual and other insurance companies: "I don't know. I don't know the answer to this question."

> **E.  The Defendants' Fraudulent Concealment and Liberty Mutual's Justifiable Reliance**

246.    The Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to Liberty Mutual.

247.    To induce Liberty Mutual to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systematically concealed their fraud and went to great lengths to accomplish this concealment.

248.    Specifically, the Defendants knowingly misrepresented and concealed facts related to Advanced Lab in an effort to prevent discovery of the fact that the Defendants unlawfully exchanged kickbacks for patient referrals.

249.    Additionally, the Defendants entered into complex financial arrangements with one another that were designed to, and did, conceal the fact that the Defendants unlawfully exchanged kickbacks for patient referrals.

250.    Furthermore, the Defendants knowingly misrepresented and concealed facts in order to prevent Liberty Mutual from discovering that the Fraudulent Services were medically unnecessary and performed – to the extent they were performed at all – pursuant to fraudulent pre-determined protocols designed to maximize the charges that could be submitted, rather than to benefit the Insureds who supposedly were subjected to the Fraudulent Services.

251.    Further, the Defendants billed for many of the fraudulent services under an alternate name – TopLab – in order to conceal the amount of billing submitted to Liberty Mutual in connection with the Fraudulent Services and to prevent Liberty Mutual from identifying the pattern of fraudulent charges submitted by Advanced Lab.

252.    The Defendants hired law firms to pursue collection of the fraudulent charges from Liberty Mutual and other insurers.  These law firms routinely filed expensive and time-consuming collection actions against Liberty Mutual and other insurers if the charges were not promptly paid in full. The collection actions that the Defendants have commenced to collect on their fraudulent claims were commenced in New York, seeking to collect No-Fault Benefits

under New York automobile insurance policies for Fraudulent Services that they purported to provide to Liberty Mutual's New York-based Insureds.

253.    Liberty Mutual is under statutory and contractual obligations to promptly and fairly process claims. The facially valid documents submitted to Liberty Mutual in support of the fraudulent charges at issue, combined with the material misrepresentations and omissions described above, were designed to and did cause Liberty Mutual to rely upon them.

254.    As a result, Liberty Mutual has incurred damages of more than $1,435,989.84 based upon the fraudulent claims, representing payments made by Liberty Mutual to Advanced Lab.

255.    Based upon the Defendants' material misrepresentations, omissions, and other affirmative acts to conceal their fraud from LIBERTY MUTUAL, LIBERTY MUTUAL did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## AS AND FOR A FIRST CAUSE OF ACTION
### Against Advanced Lab

### (Declaratory Judgment, 28 U.S.C. §§ 2201 and 2202)

256.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation set forth above.

257.    There is an actual case and controversy between Liberty Mutual and Advanced Lab regarding more than $2,765,912.34 in fraudulent billing for the Fraudulent Services that have been submitted to Liberty Mutual through Advanced Lab.

258.    Advanced Lab had, and has, no right to receive payment for any pending bills submitted to Liberty Mutual under its name because the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-

determined fraudulent protocols designed to financially enrich the Defendants, rather than to legitimately treat or otherwise benefit the Insureds.

259.    Advanced Lab has no right to receive payment for any pending bills submitted to Liberty Mutual under its name because the Fraudulent Services – to the extent that they were provided at all – were medically useless as a result of the fact that the urine drug screening results were routinely not available in time for, or reviewed for, their purported intended purpose; were not incorporated into the Insureds' treatment plans; and played no genuine role in the treatment or care of the Insureds.

260.    Advanced Lab has no right to receive payment for any pending bills submitted to Liberty Mutual under its name because the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback arrangements amongst the Defendants and others.

261.    Accordingly, Liberty Mutual requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Advanced Lab has no right to receive payment for any pending bills submitted to Liberty Mutual under its name.

<u>**AS AND FOR A SECOND CAUSE OF ACTION**</u>
<u>**Against Moshe, Gladstein, Dolsky**</u>
<u>**and Frenkel**</u>

**(Violation of RICO, 18 U.S.C. §**
**1962(c))**

262.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation set forth above.

263.    Advanced Lab is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that effected interstate commerce.

264.    Moshe, Gladstein, Dolsky and Frenkel knowingly conducted and/or

participated, directly or indirectly, in the conduct of Advanced Lab' affairs through a pattern of racketeering activity consisting of repeated violations of the mail fraud statute, 18 U.S.C. § 1341, based upon their use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for more than two years seeking no-faut payments that Advanced Lab was not entitled to receive under the New York no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billed-for-services were illusory and medically useless, and played no genuine role in the treatment or care of the Insureds; and (iv) the Defendants caused Advanced Lab to obtain its patients through the Defendants' illegal kickback scheme. The fraudulent no-fault bills and corresponding mailings submitted to Liberty Mutual that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as **Exhibit "1"**.

265.    Advanced Lab's business constituted racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent no-fault charges to insurers. The predicate acts of mail fraud are the regular way in which Moshe, Gladstein, Dolsky and Frenkel operated Advanced Lab, insofar as Advanced Lab is not engaged in a legitimate clinical laboratory business, the services billed to Liberty Mutual were unnecessary and illusory, and the testing was performed for no reason other than to generate profits. Therefore, acts of mail fraud are essential in order for Advanced Lab to function. Further, the intricate planning required to carry out and conceal the predicate acts of mail fraud imply a continued threat of criminal activity, as does the fact that the Defendants continue to attempt collection on the

fraudulent billing submitted by Advanced Lab until the present day.

266.   Advanced Lab is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to Liberty Mutual and other insurers. These inherently unlawful acts are taken by Advanced Lab in pursuit of inherently unlawful goals – namely, the theft of money from Liberty Mutual and other insurers through fraudulent no-fault billing.

267.   Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,435,989.84 pursuant to the fraudulent bills submitted by Advanced Lab at the Defendants' direction.

268.   By reason of its injury, Liberty Mutual is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### AS AND FOR A THIRD CAUSE OF ACTION
### Against Moshe, Gladstein, Dolsky, Frenkel, John and Jane
### Doe Defendants "1-10" and the ABC Entities "1-10"

### (Violation of RICO, 18 U.S.C. § 1962(d))

269.   Liberty Mutual incorporates, as though fully set forth herein, each and every allegation set forth above.

270.   Advanced Lab is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

271.   Moshe, Gladstein, Frenkel, Dolsky, the "John and Jane Doe Defendants" and the ABC Entities are employed by or associated with the Advanced Lab enterprise.

272.   Moshe, Gladstein, Frenkel, Dolsky, the "John and Jane Doe Defendants" and the ABC Entities knowingly have agreed, combined, and conspired to conduct and/or

participate, directly or indirectly, in the conduct of Advanced Lab' affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for approximately two years seeking no-fault benefits that Advanced Lab was not eligible to receive under New York no-fault insurance law because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billed-for-services were illusory and useless and played no genuine role in the treatment or care of the Insureds; and (iv) Advanced Lab obtained its patients through the Defendants' illegal kickback scheme. The fraudulent charges and corresponding mailings submitted to Liberty Mutual that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as **Exhibit "1"**.

273.    Moshe, Gladstein, Frenkel, Dolsky, the John and Jane Doe Defendants 1-10 and the ABC Entities 1-10 knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud Liberty Mutual and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to Liberty Mutual and/or by engaging in and facilitating the fraudulent treatment protocol and/or by engaging in and facilitating the illegal kickbacks used to secure referrals of patients to Advanced Lab for the medically unnecessary services.

274.    Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,435,989.84 pursuant to the fraudulent bills submitted by Advanced Lab through the Defendants' actions.

275.     By reason of its injury, Liberty Mutual is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## AS AND FOR A FOURTH CAUSE OF ACTION
### Against Moshe, Gladstein, Frenkel, Dolsky and Advanced Lab

**(Common Law Fraud)**

276.     Liberty Mutual incorporates, as though fully set forth herein, each and every allegation set forth above.

277.     Moshe, Gladstein, Frenkel, Dolsky and Advanced Lab intentionally and knowingly made false and fraudulent statements of material fact to Liberty Mutual and concealed material facts from Liberty Mutual in the course of their submission of thousands of fraudulent charges through Advanced Lab seeking payment for the Fraudulent Services.

278.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) that with regard to every claim, the Fraudulent Services were medically necessary and eligible for PIP reimbursement, when in fact they were not medically necessary and were performed pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to legitimately treat or otherwise benefit the Insureds; (ii) that with regard to every claim, the Fraudulent Services were provided for patient care and eligible for PIP reimbursement, when in fact the billed-for-services played no genuine role in the treatment or care of the Insureds; and (iii) that with regard to every claim, the Advanced Lab and the Fraudulent Services were in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, and therefore were eligible to receive PIP reimbursement, when in fact, the Fraudulent Services were provided – to the extent

that they were provided at all – pursuant to illegal kickback arrangements amongst the Defendants and others.

279.    Moshe, Gladstein, Frenkel, Dolsky and Advanced Lab intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce Liberty Mutual to pay charges submitted through Advanced Lab that were not compensable under New York's no-fault insurance laws.

280.    Moshe, Gladstein, Frenkel, Dolsky and Advanced Lab intentionally made the above-described false and fraudulent representations and concealed material facts in a calculated effort to induce Liberty Mutual to pay charges submitted by Advanced Lab that were not compensable under New Jersey's no-fault insurance laws.

281.    Liberty Mutual justifiably relied on the Defendants' false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,435,989.84 pursuant to the fraudulent bills submitted by the Defendants through Advanced Lab.

282.    Moshe's, Gladstein's, Frenkel's, Dolsky's and Advanced Lab's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages. In addition, said Defendants' fraudulent acts caused harmed to the general public and to New York's and New Jersey's public policies and interests regarding the integrity of their insurance systems.

283.    Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## AS AND FOR A FIFTH CAUSE OF ACTION
### Against Moshe, Gladstein, Frenkel, Dolsky and Advanced Lab

### (Unjust Enrichment)

284.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation set forth above.

285.    As set forth above, Moshe, Gladstein, Frenkel, Dolsky and Advanced Lab have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Liberty Mutual.

286.    When Liberty Mutual paid the bills and charges submitted by or on behalf of Advanced Lab for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments, based upon Moshe's, Gladstein's, Frenkel's, Dolsky's and Advanced Lab's improper, unlawful, and/or unjust acts.

287.    Moshe, Gladstein, Frenkel, Dolsky and Advanced Lab have been enriched at Liberty Mutual's expense by virtue of Liberty Mutual's payments of No-Fault Benefits, which payments constituted a financial benefit that Moshe, Gladstein, Frenkel, and Advanced Lab voluntarily accepted and distributed amongst themselves.

288.    Moshe, Gladstein, Frenkel, Dolsky and Advanced Lab' retention of Liberty Mutual's payments violates fundamental principles of justice, equity, and good conscience.

289.    By reason of the above, Moshe, Gladstein, Frenkel, Dolsky and Advanced Lab have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $1,435,989.84.

**WHEREFORE**, the Plaintiffs demand that a judgment be entered in their favor:

A.    On the First Cause of Action against Advanced Lab, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Advanced Lab has no

right to receive payment for any pending no-fault claims submitted to Liberty Mutual;

      B.      On the Second Cause of Action against Moshe, Gladstein, Frenkel, and Dolsky, compensatory damages pursuant to 18 U.S.C. § 1964(c) in favor of Liberty Mutual in an amount to be determined at trial but in excess of $1,435,989.84, together with treble damages, costs, reasonable attorneys' fees, and statutory interest;

      C.      On the Third Cause of Action against Moshe, Gladstein, Frenkel, Dolsky, the John Doe Defendants 1-10, and the ABC Entities 1-10, compensatory damages pursuant to 18 U.S.C. § 1964(c) in favor of Liberty Mutual in an amount to be determined at trial but in excess of $1,435,989.84, together with treble damages, costs and reasonable attorneys' fees, plus interest;

      D.      On the Fourth Cause of Action against Moshe, Gladstein, Frenkel, Dolsky and Advanced Lab, compensatory damages in common law fraud in favor of Liberty Mutual in an amount to be determined at trial but in excess of $1,435,989.84, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

      E.      On the Fifth Cause of Action against Moshe, Gladstein, Frenkel, Dolsky and Advanced Lab, an award of at least $1,435,989.84 in restitution based upon the Defendants' unjust enrichment, plus costs, interest, and such other and further relief as this Court deems just and proper.

## **DEMAND FOR TRIAL BY JURY**

The Plaintiffs demand a trial by jury as to all claims and causes so triable.

BRUNO, GERBINO, SORIANO & AITKEN, LLP

By: ___*Vincent F. Gerbino*_____

Vincent F. Gerbino (VG0555)
Shaun M. Malone (SM1543)
*Attorneys for the Plaintiffs*
445 Broad Hollow Road, Suite 420
Melville, New York 11747-4712
(631) 390-0010
Our File No.: 185-3053